[Civ. No. 45493. First Dist., Div. Two. Mar. 25, 1981.]

GEORGE BALL PACIFIC, INC., Plaintiff and Appellant, v. COLDWELL BANKER & COMPANY et al., Defendants and Respondents.

Counsel

J. A. London, Brian J. O'Grady, Theodore C. Carlstrom and Carlstrom, Heyler & Mitchell for Plaintiff and Appellant.

Charles Theodore Mathews and Edward L. Briggs for Defendants and Respondents.

OPINION

TAYLOR, P. J.—This is an appeal by the lessee, George Ball Pacific, Inc. (Ball), from a summary judgment[1] in favor of Coldwell Banker & Company (Coldwell Banker) · and its salesperson, Fraser, Ball's agents in the negotiations with the original lessor (Overmyer).[2] For the reasons set forth below, we have concluded that there was a disputed· question of fact as to whether Coldwell Banker misrepresented to Ball that Overmyer had a sufficient interest in the property to enter into a 10-year lease; accordingly, the summary judgment must be reversed.

""""Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts." (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852. . ., quoting from *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417. . . .)

""""In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the *admissible evidence* set forth in the papers and all inferences reasonably deducible from such evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from

---

[1]The appeal is from the judgment dated July 28, 1978, which: 1) reiterated the court's minute order of May 8, 1978, granting Coldwell Banker's motion for summary judgment; and 2) recited the court's June 16, 1978, denial of Ball's motion for reconsideration. The prior appeal from a July 19, 1978, order granting the summary judgment was dismissed pursuant to an abandonment filed on December 14, 1978.

[2]Ball filed the instant action against Coldwell Banker and Fraser who cross-complained for indemnity. Also initially named as a defendant was Overmyer's general manager, Luis A. Belmonte. Subsequently, the appeal was voluntarily dismissed by Ball as to Belmonte.

such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Italics added.) (Code Civ. Proc., § 437c.)

""The remedy is designed to terminate an action promptly where the purported cause of action or defense is sham or otherwise wholly unfounded. But it is futile to seek the order where any basis for a cause of action or defense can be shown. In other words, the moving party should not confuse an opponent's *weak* case with *no case at all.* The [appellate] court, construing the moving party's affidavits strictly . . . and the counteraffidavits liberally . . ., will reverse the summary judgment if any kind of case is shown," (4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 199, p. 2844.)' (*Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705, p. 719 . . . .)" (*Fosgate* v. *Gonzales* (1980) 107 Cal.App.3d 951, 954-955 [166 Cal.Rptr. 233].)

First, we turn to the parties' procedural contentions pertaining to Ball's motion for reconsideration, as the resolution of this issue determines whether the affidavits and declarations filed pursuant to that motion are properly part of the record on appeal. ██ As Coldwell Banker correctly points out, former Code of Civil Procedure section 1008, at the time here pertinent,[3] provided no statutory authority per-

---

[3]When Ball's motion for reconsideration was filed on May 12, 1978, the applicable statute, former Code of Civil Procedure section 1008, read as follows: "When an application for an order has been made to a judge, or to the court, and refused in whole or in part, or granted conditionally, or on terms, and *subsequent application for the same order, upon an alleged different state of facts,* shall be made, it shall be shown by affidavit what application was before made, when and to what judge, what order or decision was made thereon and what new facts are claimed to be shown. For a failure to comply with this requirement, any order made on such subsequent application may be revoked or set aside on ex parte motion."

Former Code of Civil Procedure section 1008 was repealed by Statutes of 1978, chapter 631, section 1, and the present version added by Statutes of 1978, chapter 631, section 2, which provides, so far as here pertinent: "(a) When an application for an order has been made to a judge, or to the court, and refused in whole or in part, or granted, or granted conditionally, or on terms, *any party affected by the order* may, within ten (10) days after knowledge of the order and based upon an alleged different state of facts may, make application to the same judge who made the order, to reconsider the matter and modify, amend or revoke the prior order.

"(b) When the party who originally made an application for an order which was refused in whole or part, or granted conditionally or on terms, makes a subsequent application for the same order upon an alleged different state of facts, it shall be shown by affidavit what application was made before, when and to what judge, what order or decision was made thereon, and what new facts are claimed to be shown. For a failure to comply with this requirement, any order made on such subsequent application may be revoked *or set aside on ex parte motion."* (Italics added.)

The present statute became effective on January 1, 1979 (see also 10 Pacific L.J. 344-346).

mitting a nonmoving party action to file a motion for reconsideration. However, Coldwell Banker failed to note that prior to the enactment of the 1978 version of Code of Civil Procedure section 1008, case law recognized certain exceptions permitting a nonmoving party to file a motion for reconsideration, including an obviously procedural interim order (*Travelers Ins. Co. v. Superior Court* (1977) 65 Cal.App.3d 751, at pp. 759-760 [135 Cal.Rptr. 579]; (*Harth v. Ten Eyck* (1941) 16 Cal.2d 829, 832 [108 P.2d 675]; *Harth v. Ten Eyck* (1939) 12 Cal.2d 709, 710 [87 P.2d 693]; *Carver v. Platt* (1960) 179 Cal.App.2d 140, 142 [3 Cal.Rptr. 687]; see also Goodman, *The Power of The Trial Judge to Change A Prior Ruling on a Motion* (1970) 45 State Bar J. 483, at p. 489, and fn. 13 at p. 491). ██ As the court's minute order granting the summary judgment was clearly such an interim order,[4] we can only conclude that Ball's motion to reconsider was properly made and considered by the trial court.[5] Accordingly, we conclude that, contrary to Coldwell Banker's contention, the 1978 version of Code of Civil Procedure section 1008, in part, broadened the existing case law *to permit any party affected by the proceeding* to file a motion for reconsideration.

Applying the above quoted rules pertaining to summary judgments to the affidavits and counteraffidavits on the motion for summary judgment and the motion for reconsideration, the following appears:

In 1972, Ball needed a larger warehouse for its horticultural operations in the San Francisco Peninsula area. Ball's president, D. Messick, directed Ethel Peterson, Ball's then assistant secretary and treasurer, to engage a broker. In May 1972, Ms. Peterson met with defendant Fraser, a salesperson for Coldwell Banker, and informed him of Ball's requirements. Fraser submitted several lease proposals to Ms. Peterson and took her to see several potential sites, including the "Overmyer Building" at 111 Uranium Road in Sunnyvale. The building was known by this name and bore a sign with that name.

---

[4]Of course, on appeal from the final judgment, we may review any nonappealable intermediate order that involves or necessarily affects the merits (*City of Oakland v. Darbee* (1951) 102 Cal.App.2d 493, 505 [227 P.2d 909]).

[5]Coldwell Banker quotes (but does not cite) a part of the opinion of this court (Div. Three) in *Lavrischeff v. Blumer* (1978) 77 Cal.App.3d 406, at page 411 [143 Cal.Rptr. 567], to argue erroneously that Ball's motion was improperly made and heard by the trial court. *Lavrischeff* is not apposite, as the pitfall there addressed (at p. 411) was the practice of moving for reconsideration rather than seeking a remedy by appeal where the order in question is a final and appealable one.

Fraser also discussed the lease of the "Overmyer Building" with Messick. Fraser took Messick to see the building and also submitted several items of advertising and sales literature from Overmyer. Ultimately, Messick asked Fraser to negotiate a lease with Overmyer on behalf of Ball. Fraser talked to H. J. Jacobs, an Overmyer employee, who referred to the building as "our building."

As a result, about March 28, 1973, Ball entered into a lease with Overmyer, who was designated as lessor at its New York address. The lease was for 20,000 square feet of warehouse space for a 10-year term at the cost of $1,800 a month, and was signed by the vice president and secretary of Overmyer. The lease and its attached documents bore a heading of "Overmyer Distribution Services, Inc., Space for Industry." The same designations and parties were used in a construction addendum to the lease executed on July 23, 1973. Coldwell Banker received the first three months' rent as compensation for its services.

In late 1973, Overmyer filed for bankruptcy in New York. Ball was served with a notice by the sheriff to pay the rent directly to Uranium Road Investments (Uranium Road), a California limited partnership, the true owner of the building, pursuant to its sale and leaseback arrangement with Overmyer. By threatening eviction, Uranium Road forced Ball to renegotiate the lease for a monthly rental of $2,100, or a total of $49,650, the general damages sought by Ball in the instant action.

Prior to the fall of 1973, Messick and Peterson believed that Overmyer owned the building bearing its name; neither had knowledge of the sale and leaseback operation between Overmyer and Uranium Road.

Fraser indicated that while he, in fact, believed that Overmyer owned the building, he never told or represented to Ball or anyone that Overmyer owned the building. Fraser also averred that Ball had proceeded to negotiate independently for the lease and construction addendum, and that Ball's attorneys reviewed the lease and failed to ascertain the true owner. On the basis of this declaration, the court below concluded that there was no misrepresentation, as Fraser and Coldwell Banker did not know that Overmyer did not, in fact, own the building, and gave notice of its intent to grant the motion for summary judgment.[6]

---

[6]The record indicates that the trial court also: 1) questioned whether Coldwell Banker had a duty to ascertain and disclose the true owner of the property to Ball; and 2)

Prior to the entry of the final judgment on July 28, 1978, Ball filed its motion for reconsideration. The new facts added came from the verified deposition of Belmonte, Overmyer's general manager. Belmonte indicated that it was common knowledge in the brokerage community (which included Coldwell Banker through whom Overmyer had negotiated leases in the past) that Overmyer's business mode was to engage in sale and leaseback operations and that Overmyer did not own the property leased to Ball. Coldwell Banker did not deny or controvert Belmonte's deposition, but filed Fraser's supplemental declaration. Fraser declared that prior to negotiating the lease with Ball, he had checked the then current tax assessor's roll to assure himself that Overmyer, in fact, owned the property.

Ball then provided the court with a copy of the then current tax assessor's roll. Overmyer's name appeared as the mailing address, but Overmyer was not listed on the roll as the owner of the property. Thereafter, Fraser filed a supplemental declaration recanting his above mentioned statement as follows: "[I]n the subject lease transaction, . . . *I did not check the tax rolls . . . .*" (Italics added.) Fraser never denied that he had made representations to Messick and Peterson that: 1) Overmyer was a large, national organization which owned warehouses all over the country and many in the Bay Area; 2) Overmyer was a large and reputable operation with facilities all over the country and even owned buildings in West Germany; 3) the building in question was the Overmyer warehouse that was available and had been developed and built by Overmyer; 4) Fraser wanted Ball to look at the building with Jacobs, the sales manager of Overmyer; 5) the landscaping and trees were put in by Overmyer to comply with city ordinances; 6) Overmyer also installed sprinklers in the building which would save insurance costs; Overmyer was a good landlord; and 7) Fraser had done business with Overmyer before in Oakland.

Ball also adduced from the declaration of William Henderson, director of the California Association of Realtors, that it was the custom and practice in Santa Clara County for the broker or salesman to inform a lessee as to the actual record title holder of the property; if the broker or salesman did not personally know the actual title holder, he should determine that information for himself.

---

based its decision on Messick's inability to remember a specific occasion on which Fraser had stated in so many words that Overmyer owned the building.

It is readily apparent from the above summary of the facts that there were numerous disputed issues of fact primarily focused on the nature and extent of Fraser and Coldwell Banker's representations to Ball that Overmyer either owned the building or had a sufficient interest to enter into a 10-year lease. In all of the preliminary negotiations, as well as in the lease and its attached documents, Overmyer was referred to as the "lessor." Fraser's declaration in support of the motion for summary judgment stated that he never misrepresented to Ball that Overmyer owned the building. However, the only reasonable inference from the use of the term "lessor" is that the lessor owns the building.

We recently set forth the fiduciary duties of a real estate broker to his client in *Alhino* v. *Starr* (1980) 112 Cal.App.3d 158, at page 169 [169 Cal.Rptr. 136], as follows: "The general principles of agency (Civ. Code, §§ 2228 and 2322) combine with the statutory duties created by the Real Estate Law (Bus. & Prof. Code, § 10176).  "'The law imposes on a real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary.' [Citations.] This relationship not only imposes upon him the duty of acting in the highest good faith toward his principal but precludes the agent from obtaining any advantage over the principal in any transaction had by virtue of his agency. [Citation.]" (*Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 674-675 . . . .) A real estate licensee is "charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]" [Citations.]' (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 782 . . . .)"

Here, there can be no question that the nature and extent of Overmyer's interest in the property was a material fact.[7] Contrary to the trial court's conclusion, Coldwell Banker's actual knowledge of the nature and extent of Overmyer's interest was not determinative. As we have explained above, the main issue was the nature and extent of the representations in the light of its fiduciary duties and the customary practices in the community. Fraser's declarations on Ball's motion for reconsideration, in and of themselves, contradict each other as to whether Fraser complied with the community standard. We also note that the record reveals another area of potential factual dispute as to

---

[7]We note that the parties and the trial court erroneously focused only on the true ownership of the property rather than on any representations that Overmyer had a sufficient interest to enter into a 10-year lease.

whether Coldwell Banker was, in fact, Ball's agent in the final lease negotiations. We further direct the attention of the parties to the principles applicable to the liability of Coldwell Banker for the acts of Fraser, which we also discussed in *Alhino, supra*, 112 Cal.App.3d, at pages 173-174.

The summary judgment is reversed.

Rouse, J., and Miller, J., concurred.