[Civ. No. 30250. Fourth Dist., Div. Three. Aug. 19, 1983.]

FREDERICK O. MacMANUS et al., Plaintiff and Appellants, v.
A. E. REALTY PARTNERS et al., Defendants and Respondents.

278

**COUNSEL**

Frederick O. MacManus, in pro. per., A. Thomas Golden and Cheri L. Hubka-Sparhawk for Plaintiffs and Appellants.

Marvin A. Freedland as Amicus Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, John J. Swenson, Mary Laura Davis and Charles J. Stevens for Defendants and Respondents.

**OPINION**

**TROTTER, P. J.**—Plaintiffs appeal a judgment of dismissal following the sustaining of a demurrer to their third amended complaint without leave to amend. We reverse the judgment holding the complaint states a cause of action for violations of Civil Code section 2995 and the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.)

■ The complaint alleges the following facts which are presumed true for purposes of reviewing the order sustaining the demurrer. (*Bohrer* v. *County of San Diego* (1980) 104 Cal.App.3d 155, 158 [163 Cal.Rptr. 419].)

Frederick O. MacManus and Barbara-Helene Smith (plaintiffs) purchased a home in Westwind, a subdivision developed by A. E. Realty Partners (AERP) in San Diego County. AERP, doing business as Ponderosa Homes, is a major developer and seller of residential real estate in California. Its principal place of business is in Irvine. Realty Escrow, Inc. (REI) is owned and controlled by AERP and derives all of its business from that company. Its principal place of business is also in Irvine.

From 1976 through 1980, AERP gained an income of $591 million from its sale of 6,404 homes. REI provided the escrow services for more than 99.9 percent of the conveyances and received fees totalling $2,045,343.

When plaintiffs decided to purchase their home, they were given a copy of the Real Estate Commissioner's Public Report which informed prospective buyers of AERP's financial interest in the escrow company to be used in the sale or lease of Westwind residences. After plaintiffs had read the report, an AERP sales agent prepared an offer to purchase (Agreement) for their signature. Among other conditions, the Agreement required the home buyer to sign escrow instructions on forms provided by AERP within 10 days after its acceptance of the buyer's offer. The buyer was further obligated to execute and deposit additional documents, including the escrow instructions, or be considered in default. Should the buyer default, AERP could cancel the Agreement and retain as liquidated damages any fees the buyer previously paid.

Before signing the Agreement, plaintiffs asked if changes could be made. They were told only AERP's Agreement form could be used, no changes could be made in the preprinted terms and, if changes were made, the Agreement would not be accepted by AERP.

Upon signing the Agreement, plaintiffs were furnished written notice of their right to choose a title insurance company. They selected, in writing, St. Paul Title Company. Plaintiffs then received escrow instructions identifying REI as the entity to provide escrow services for their conveyance.

Included in the instructions (attached as an exhibit to the complaint) was the following NOTICE OF INTEREST:

"ALL PARTIES TO THIS TRANSACTION ARE HEREBY ADVISED THAT REALTY ESCROW, INC., THE ESCROW AGENT ABOVE NAMED IS A CORPORATION WHOLLY OWNED BY AE REALTY PARTNERS, A GENERAL PARTNERSHIP BY AETNA LIFE INSURANCE COMPANY, A CONNECTICUT CORPORATION AND AE DEVELOPMENT GROUP, INC., A CONNECTICUT CORPORATION A WHOLLY OWNED SUBSIDIARY OF AETNA CASULTY [*sic*] SURETY COMPANY, AND FOR WHOM REALTY ESCROW, INC. PERFORMS ESCROW SERVICES AT A NEGOTIATED BULK RATE. ALL PARTIES TO THIS TRANSACTION ARE FURTHER ADVISED THAT THE SOLE STOCKHOLDER OF REALTY ESCROW, INC. IS ALSO THE SOLE STOCKHOLDER OF PONDEROSA BROKERAGE COMPANY, A CALIFORNIA CORPORATION AND FURTHER AE REALTY PARTNERS IS ENGAGED IN BUSINESS UNDER THE NAME AND STYLE PONDEROSA HOMES. ALL PARTIES AGREE THAT THE SERVICES OF ANY OF THE FOREGOING COMPANIES MAY BE USED IN CONNECTION WITH THIS TRANSACTION, THAT SUCH USE HAS

Not Been Made a Condition of This Sale by Any Party." Plaintiffs signed and returned the escrow instructions as required by the Agreement.

The conveyance of the Westwind residence was completed in July 1979. Plaintiffs paid REI various closing fees totaling $319. Comparable escrow services in San Diego County were available at costs of $127.50 to $269.

From August 25, 1978,[1] through July 16, 1980,[2] AERP conveyed 386 lots in San Diego County containing single family residences. REI provided escrow services for all of the conveyances at costs $50 to $191.50 higher than those of local competitors. During the same period AERP also conveyed 2,080 lots of single family residences in other California counties. REI handled all but two of the closings and charged buyers inflated fees. The purchase of AERP properties was conditioned upon the procurement of REI escrow services.

Plaintiffs filed a class action on behalf of themselves and other buyers of AERP homes who were compelled to use the services of REI between August 25, 1978, and July 16, 1980.

## Discussion

### Alleged Violation of Civil Code Section 2995

Plaintiffs' first cause of action is predicated on Civil Code section 2995 (hereafter section 2995).[3] At the outset we must decide whether it is

---

[1]The date Civil Code section 2995 was enacted.

[2]The date the instant suit was commenced.

[3]Section 2995 provides: "No real estate developer shall require as a condition precedent to the transfer of real property containing a single family residential dwelling that escrow services effectuating such transfer shall be provided by an escrow entity in which the real estate developer has a financial interest.

"A real estate developer who violates the provisions of this section shall be liable to the purchaser of the real property in the amount of three times the amount charged for the escrow services, but in no event less than two hundred fifty dollars ($250), plus reasonable attorney's fees and costs.

"For purposes of this section 'financial interest' means ownership or control of 5 percent or more of an escrow entity.

"For purposes of this section 'real estate developer' means a person or entity having an ownership interest in real property which is improved by such person or entity with single family reisdential [sic] dwellings which are offered for sale to the public.

"For purposes of this section 'escrow entity' includes a person, firm or corporation.

"Any waiver of the prohibition contained in this section shall be against public policy and void."

barred by section 340, subdivision (1) of the Code of Civil Procedure.[4] AERP and REI demurred on the ground plaintiffs filed the action more than one year after signing the Agreement and escrow instructions. Plaintiffs argue the action is subject to a three-year statute of limitations (Code Civ. Proc., § 338, subd. 1)[5] and it did not accrue until the transfer of title to their residences.[6]

■ Since the Legislature did not prescribe a period of limitations within section 2995, we must determine the applicable period. (See *Huntington* v. *Attrill* (1892) 146 U.S. 657 [36 L.Ed. 1123, 13 S.Ct. 224]; *Levy* v. *Superior Court* (1895) 105 Cal. 600 [38 P. 965].) Our decision must depend upon whether the statute is characterized as "penal" or "remedial." (*Ibid.*) The distinction is rarely clear cut, for the same provision may be penal to the offender and remedial to the victim. (See *Levy, supra,* at pp. 607-608; *Riggs* v. *Government Emp. Financial Corp.* (9th Cir. 1980) 623 F.2d 68, 72, citing *Huntington* v. *Attrill, supra,* 146 U.S. at p. 667 [36 L.Ed. at p. 1127] Nevertheless, to determine the applicable limitations period of section 2995, we examine its intent and language. (See *Riggs* v. *Government Emp. Financial Corp., supra,* 623 F.2d 68, 69-71.)

■ Its legislative history reveals residential buyers have often been forced to use an escrow entity in which the seller has an interest. Section 2995 was enacted as a remedial statute to protect the buyer against in-house escrow services. It was intended to assure the buyer's freedom to select an escrow entity and that entity's independence and neutrality.

Section 2995 provides recovery where use of a particular escrow is required as a condition precedent to the transfer of a single family residence. It is concerned with the effect of a buyer/seller agreement rather than the intent of the seller. Since liability is not dependent on some degree of culpability, recovery is construed as remedial in nature. (See *Riggs, supra,* at p. 71.)

Section 2995 also provides the aggrieved buyer shall receive treble damages, not less than $250. "That a portion of such damages is statutorily set, rather than being subject to proof like most remedial damages, does not necessarily make the statute penal." (*Riggs, supra,* at p. 71.) Further, the

---

[4]Code of Civil Procedure section 335 provides: "The periods prescribed for the commencement of actions other than for the recovery of real property, are as follows:"

Section 340, subdivision (1), provides in pertinent part: "Within one year:

"An action upon a statute for a penalty or forfeiture, when the action is given to an individual, or to an individual and the state, except when the statute imposing it prescribes a different limitation."

[5]Section 338, subdivision 1, provides in pertinent part: "Within three years:

"An action upon a liability created by statute, other than a penalty or forefeiture."

[6]The trial court did not address this issue.

liquidated damage measure is consistent with a remedial purpose, for when a buyer is deprived of using comparable escrow services, the value of those services, or actual damages, may be difficult to ascertain. (*Ibid.*)

In light of the intent and language of section 2995 we characterize it as remedial, and a three-year limitations period will be applied. (Code Civ. Proc., § 338, subd. 1.)

■ Finally, plaintiffs' first cause of action accrued on July 18, 1979, the date escrow closed and fees were collected by REI, and not on the dates the Agreement or escrow instructions were signed. Section 2995 accords a right of action to the "purchaser" of the residence, i.e., one who has acquired title (see *Anderson* v. *Badger* (1948) 84 Cal.App.2d 736, 744 [191 P.2d 768]) or to whom title has been "transferred." (See Civ. Code, § 1039.) Further, a plain reading of the statute shows there is no claim unless the party suffers injury as a result of a condition precedent, i.e., the use of a particular escrow entity. This can only arise when escrow closes and the fees are paid. Plaintiffs' cause of action is clearly not time barred.

■ The demurrer interposed by AERP and REI was sustained on the following grounds: "Insufficient facts are pleaded to support a requisite element of a claim under Civil Code Section 2995, namely, that A.E. Realty Partners conditioned the sale of Ponderosa Homes on the use of Realty Escrow's escrow services, and the escrow instructions . . . expressly negate the existence of a conditioned sale." We disagree.

The elements constituting a claim under section 2995 appear on its face: (1) A real estate developer with a financial interest in a particular escrow entity, (2) who conditions the sale of a single family residence, (3) on the procurement of that escrow entity's services.

The complaint alleged AERP required buyers to use the services of REI, its wholly owned entity, as a condition precedent to acquiring title to single family residences. These allegations are supported in the complaint by specific facts rather than by conclusionary assertions. (See e.g., *People* v. *McKale* (1979) 25 Cal.3d 626, 635 [159 Cal.Rptr. 811, 602 P.2d 731]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 268, pp. 1939-1940.) Plaintiffs' first cause of action clearly withstands demurrer. Whether a condition precedent existed as pleaded and whether the escrow instructions negated its existence are questions of fact to be resolved at trial. (E.g., *McKale, supra,* at pp. 634-635.)

### Alleged Violation of Cartwright Act

■ The second cause of action is based on Business and Professions Code sections 16720 and 16726 of the Cartwright Act, the principal Cali-

fornia antitrust statute. Both sections are patterned after section 1 of the Sherman Act (15 U.S.C. § 1; see *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953]) and cases construing the Sherman Act are applicable to problems arising under the Cartwright Act. (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833].)[7]

Section 16720 prohibits the combination of resources of two or more persons to prevent market competition or to restrain trade as detailed in the section.[8] Such combinations or trusts are "unlawful, against public policy and void." (Bus. & Prof. Code, § 16726.) ■ Although the literal language of these sections and their federal counterpart prohibit any combination to restrain trade, courts have added a judicial gloss requiring the restraints to be "unreasonable." (*Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238-241 [62 L.Ed. 683, 687-688, 38 S.Ct. 242]; *People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 727 [264 P.2d 31].) However, certain practices are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use" because of "their pernicious effect on competition and lack of any redeeming virtue." (*Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d

---

[7]In *Bruno* v. *Superior Court* (1981) 127 Cal.App.3d 120, 131 [179 Cal.Rptr. 342], the court declared: "Interpretations of the federal antitrust laws are of relevance to the Cartwright Act problems [citation], but we respectfully exercise our prerogative to disagree with the cited cases."

[8]Business and Professions Code section 16720 provides: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:

"(a) To create or carry out restrictions in trade or commerce.

"(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

"(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

"(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

"(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following:

"(1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value.

"(2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure.

"(3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity.

"(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected."

545, 549, 78 S.Ct. 514], partially quoted in *Suburban Mobile Homes, Inc.* v. *AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 541 [161 Cal.Rptr. 811].) Such practices, considered illegal per se, include tying arrangements.

■ Tying arrangements involve a seller's refusal to sell one product (the tying product) unless the buyer also purchases a second product (the tied product) from the seller. (*Id.* at pp. 542-543.)

To allege an illegal per se tying arrangement, the complaint must show: (1) a tying arrangement existed, i.e., the sale of a tying product was linked to the purchase of the tied product; (2) the seller had sufficient economic power in the tying market to coerce the sale of the tied product; (3) a substantial amount of commerce was affected by the tying arrangement; and (4) the buyer suffered damages proximately caused by the arrangement. (*Suburban Mobile Homes, supra,* at pp. 542-543; see also *Classen* v. *Weller* (1983) 145 Cal.App.3d 27 [192 Cal.Rptr. 914].)

■ The trial court ruled plaintiffs failed to allege sufficient facts to support two elements of an illegal per se tying claim under sections 16720 and 16726: (1) that AERP conditioned the sale of Ponderosa Homes on the use of REI's escrow services, and the escrow instructions expressly negate the existence of a conditioned sale; and (2) that AERP had sufficient economic power in any tying product market to compel the purchase of escrow services, the tied product. However, the complaint alleges AERP conditioned the sale of its residential property (the tying product) on the "purchase" of REI's escrow services (the tied product) thereby violating sections 16720 and 16726.

We conclude the tying arrangement, or conditioned sale of Ponderosa Homes, was sufficiently alleged for reasons already stated in our discussion of the first cause of action. (See also *Classen, supra,* at pp. 36-37.) Plaintiffs also stated facts to support the element of economic power in the tying market.

■ Sufficient economic power may be inferred if the seller occupies a dominant position in the relevant market. (See e.g., *International Business Machines Corp.* v. *U. S.* (1936) 298 U.S. 131, 135-136 [80 L.Ed. 1085, 1088-1089, 56 S.Ct. 701]; *Moore* v. *Jas. H. Matthews & Co.* (9th Cir. 1977) 550 F.2d 1207, 1215.) The power is sufficient even though it falls short of dominance and exists only with respect to some buyers. (*Suburban Mobile Homes, supra,* at p. 544.) Finally, the requisite power can be inferred from the tying product's uniqueness or desirability to buyers. (*Ibid.; Moore, supra,* at pp. 1215-1216.)

The complaint alleged AERP sold 6,404 residential properties for a total sum of $591 million in the four years preceding this litigation. During this time, there was a housing shortage especially acute in those areas where AERP conducted business. Each Ponderosa Home was marketed as a unique product, "custom design[ed] by award winning architects" in "choice and convenient locations" throughout the state. These facts support an allegation of AERP's sufficient economic power in the real estate market.

■ The trial court further sustained the demurrer to plaintiffs' second cause of action for failure to state facts sufficient to support the element of a combination in restraint of trade between two distinct business entities.

■ The showing of a combination or conspiracy is a threshold requirement which must be met before the reasonableness of an alleged restraint of trade can be considered. (*Harvey* v. *Fearless Farris Wholesale, Inc.* (9th Cir. 1979) 589 F.2d 451, 453.) This requirement precludes liability for coordinated activity among multiple corporations operating as a single entity. (*Thomsen* v. *Western Elec. Co. Inc.* (9th Cir. 1982) 680 F.2d 1263; *Las Vegas Sun, Inc.* v. *Summa Corp.* (9th Cir. 1979) 610 F.2d 614; *Knutson* v. *Dailey Review* (9th Cir. 1976) 548 F.2d 795; see also *Bondi* v. *Jewels by Edwar, Ltd.* (1968) 267 Cal.App.2d 672 [73 Cal.Rptr. 494].)

The single entity test, or intraenterprise conspiracy theory, is a frequently litigated issue. The problem, defining a single entity, turns on the particular facts. (*Mutual Fund Investors* v. *Putnam Management Co.* (9th Cir. 1977) 553 F.2d 620.) This test is easily satisfied when corporate policies are set by one individual or by a parent corporation (see, e.g., *Las Vegas Sun, supra,* at p. 618) to the extent there is no autonomy (see *Harvey, supra,* p. 457). At the other extreme, jointly owned corporations that compete in the marketplace, hold themselves out to the public as competing corporations, or set policy independently, are capable of conspiring to restrain trade as distinct entities. (*General Business Systems* v. *North Am. Philips Corp.* (9th Cir. 1983) 699 F.2d 965, 980.)

■ REI is wholly owned by AERP for whom it performs escrow services at a negotiated bulk rate. REI paid cash dividends to AERP, its sole shareholder, during the four years preceding this action. All but one of the current officers of REI are officers of AERP. All but one of the directors of REI are also officers of AERP. However, the degree of control AERP exercises over REI's day-to-day operations is not shown. (See, e.g., *General Business Systems* v. *North Am. Philips Corp., supra,* 699 F.2d 965.)

Nevertheless, whether or not AERP and REI operate as a single entity has no effect on plaintiffs' cause of action which, on its face, satisfies the

threshold requirement. Where tying arrangements are alleged, there is ample authority the required combination can exist as between the defendants and the plaintiff/victim. (See e.g., *Roberts* v. *Elaine Powers Figure Salons, Inc.* (9th Cir. 1983) 708 F.2d 1476; *Siegel* v. *Chicken Delight, Inc.* (9th Cir. 1971) 448 F.2d 43.)

In *Perma Mufflers* v. *Int'l Parts Corp.* (1968) 392 U.S. 134, 141-142 [20 L.Ed.2d 982, 991-992, 88 S.Ct. 1981], the Supreme Court determined: "There remains for consideration only the Court of Appeals' alternative holding that the Sherman Act claim should be dismissed because respondents were all part of a single business entity and were therefore entitled to cooperate without creating an illegal conspiracy. But since respondents Midas and International availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities. [Citations.] In any event each petitioner can clearly charge a combination between Midas and himself, as of the day he unwillingly complied with the restrictive franchise agreements [citations] . . . ."

This line of reasoning was recently following by the Oregon Supreme Court in *King City Realty, Inc.* v. *Sunpace Corp.* (1981) 291 Ore. 573 [633 P.2d 784], which concerned a tying arrangement between a seller and buyer of lots with a "list back" agreement. Faced with arguments akin to those of AERP and REI, the *King* court held the defendant's affirmative defense sufficiently pled the "elements" of an illegal tying arrangement under the Oregon equivalent of section 1 of the Sherman Act. (633 P.2d at pp. 787-789.)

In light of the preceding cases, we conclude the second cause of action alleged facts sufficient to show a combination in restraint of trade between plaintiffs and AERP/REI, as distinct business entities.

 Lastly, we address the trial court's determination that two additional elements of an unreasonable restraint of trade were not sufficiently alleged: (1) AERP's and REI's intention to injure competition, and (2) injury to competition as a result of their conduct.

 Section 1 of the Sherman Act requires only a general intent on the part of a defendant. (16A Von Kalinowski, Business Organizations, Antitrust Laws and Trade Regulation, § 36.01[3][b].) General intent is usually inferred from the particular circumstances. (*Ibid.*) A plaintiff need only show a defendant acted with the intention that his acts have their natural consequences and with knowledge at least one other person would act in conjunction with the defendant. (*Interstate Circuit* v. *U. S.* (1939) 306 U.S.

208 [83 L.Ed. 610, 59 S.Ct. 467]; *Northern California Pharmaceutical Ass'n* v. *United States* (9th Cir. 1962) 306 F.2d 379.)

 From the face of the complaint, an allegation of AERP's and REI's intent to injure competition can be inferred. It alleged defendants carried out enumerated practices in furtherance of a combination for the unlawful purpose of restricting trade, thus injuring competition. It also claimed direct and proximate damages resulting from the conditioned sale, to the extent plaintiffs were forced to pay inflated escrow fees. The trial court erred in ruling, as a matter of law, that such elements were not sufficiently pleaded. (See *Saxer* v. *Philip Morris, Inc.* (1975) 54 Cal.App.3d 7 [126 Cal.Rptr. 327].)

Judgment of dismissal is reversed, and the matter is ordered to proceed on the third amended complaint.

Crosby, J., and Sonenshine, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 26, 1983.