[No. G003232. Fourth Dist., Div. Three. Oct. 29, 1987.]

FREDERICK O. MacMANUS et al., Plaintiffs and Appellants, v. A. E. REALTY PARTNERS et al., Defendants and Respondents.

**COUNSEL**

Frederick O. MacManus, in pro. per., A. Thomas Golden and Cheri L. Hubka-Sparhawk for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Sanford N. Gruskin, Assistant Attorney General, Thomas P. Dove and Gary Garfinkle, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, John J. Swenson, Mary Laura Davis, D. Neil Radey and Daniel G. Swanson for Defendants and Respondents.

**OPINION**

**SONENSHINE, Acting P. J.**—Frederick O. MacManus and Barbara-Helene Smith appeal orders (1) denying their application to allow a class action, (2) granting summary judgment against them on their cause of action under the Cartwright Act, (3) granting judgment on the pleadings to

and dismissal of Realty Escrow, Inc., and (4) denying them leave to amend their complaint.

I

In 1979, MacManus and Smith purchased a home from A. E. Realty Partners (AERP). The sales agreement required their signatures on escrow instructions to be provided by AERP.[1] The forms were received bearing the name of Realty Escrow, Inc. (REI), a wholly owned subsidiary of AERP. MacManus and Smith had been informed of the relationship between the entities through the Real Estate Commissioner's Public Report, but signed an escrow instruction stating "the services of any of the foregoing companies [including REI] may be used in connection with this transaction, that such use has not been made a condition of this sale by any party." Escrow closed July 18, 1979, with fees paid in the amount of $319, allegedly in excess of the standard charge.

In July 1980, MacManus filed a class action on behalf of all AERP homebuyers who similarly were required, from the time Civil Code section 2995 was enacted, to accept REI for escrow purposes as a "condition" to purchase of their homes.[2] The first cause of action alleged a violation of Civil Code section 2995; the second cause of action was grounded on a violation of California's antitrust statute, the Cartwright Act. (Bus. & Prof. Code, § 16720 et seq.) AERP and REI successfully demurred to the third amended complaint and a judgment of dismissal was entered against MacManus.

MacManus appealed to this court and we reversed, "holding the complaint states a cause of action for violations of Civil Code section 2995 and the Cartwright Act." (*MacManus* v. *A. E. Realty Partners* (1983) 146

---

[1] Paragraph 2 of the sales agreement provided: "Within ten (10) days from date of this Agreement, BUYER will sign escrow instructions on the form provided by the SELLER."

[2] Civil Code section 2995 provides: "No real estate developer shall require as a condition precedent to the transfer of real property containing a single family residential dwelling that escrow services effectuating such transfer shall be provided by an escrow entity in which the real estate developer has a financial interest.

"A real estate developer who violates the provisions of this section shall be liable to the purchaser of the real property in the amount of three times the amount charged for the escrow services, but in no event less than two hundred fifty dollars ($250), plus reasonable attorney's fees and costs.

"For purposes of this section 'financial interest' means ownership or control of 5 percent or more of an escrow entity.

"For purposes of this section 'real estate developer' means a person or entity having an ownership interest in real property which is improved by such person or entity with single family residential dwellings which are offered for sale to the public.

"For purposes of this section 'escrow entity' includes a person, firm or corporation.

"Any waiver of the prohibition contained in this section shall be against public policy and void."

Cal.App.3d 275, 280 [194 Cal.Rptr. 567].) "The elements constituting a claim under section 2995 appear on [the complaint's] face." (*Id.,* at p. 284.) "Whether a condition precedent existed as pleaded and whether the escrow instructions negated its existence are questions of fact to be resolved at trial." (*Ibid.*) With regard to the Cartwright Act allegations, we noted certain actions to "prevent market competition or to restrain trade" (*id.,* at p. 285) are presumed unreasonable or illegal.

In September 1984, AERP and REI moved for summary judgment on the antitrust cause of action based on a United States Supreme Court case, *Copperweld Corp.* v. *Independence Tube Corp.* (1984) 467 U.S. 752 [81 L.Ed.2d 628, 104 S.Ct. 2731]. The motion was granted, the court adopting the *Copperweld* proposition that a parent and its wholly owned subsidiary are incapable of forming a conspiracy.

In April 1985, MacManus sought certification of the class. This, too, was denied, in August. In September, REI was granted summary judgment under the first cause of action because Civil Code section 2995 proscribes certain conduct only of a "real estate developer." REI was effectively dismissed from the case. MacManus timely appealed.

## II

 Does *Copperweld Corp* v. *Independence Tube Corp., supra,* 467 U.S. 752 negate the possibility of a cause of action against AERP and its wholly owned subsidiary? For two reasons, we conclude it does not. First, our holding in *MacManus* v. *A. E. Realty Partners, supra,* 146 Cal.App.3d 275, recognizing a stated cause of action under the Cartwright Act, is the law of the case. Second, *Copperweld,* rather than prohibiting a claim for violation of the antitrust statutes under these particular circumstances, sanctions it.

 " ' "[W]here, upon an appeal, the supreme court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and, as here assumed, in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is errone-ous in that particular." ' " (*Clemente* v. *State of California* (1985) 40 Cal.3d 202, 211 [219 Cal.Rptr. 445, 707 P.2d 818], quoting from *People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211].)

The principle applies equally to intermediate appellate decisions. (*Ibid.*) An exception to the doctrine may arise where there "is an intervening or

contemporaneous change in the law." (*Id.,* at p. 212.) In the first MacManus appeal, we held a cause of action was stated under the Cartwright Act "whether or not AERP and REI operate as a single entity" (*MacManus* v. *A. E. Realty Partners, supra,* 146 Cal.App.3d 275, 287) because "there is ample authority the required combination can exist as between the defendants and the plaintiff/victim." (*Id.,* at p. 288.) *Copperweld* does not "change" the law upon which we based our decision.

In *Copperweld,* a parent company and its subsidiary followed a path of conduct intended to thwart operations of a newly formed competitor. The Seventh Circuit affirmed a jury award to the competitor on its antitrust claim pursuant to the first section of the Sherman Act (15 U.S.C. § 1), finding "liability was appropriate 'when there is enough separation between the two entities to make treating them as two independent actors sensible.'" (*Copperweld Corp.* v. *Independence Tube Corp., supra,* 467 U.S. 752, 759 [81 L.Ed.2d 628, 635].) In reversing, the United States Supreme Court found "Section 1 of the Sherman Act . . . reaches unreasonable restraints of trade effected by a 'contract, combination . . . or conspiracy' between *separate* entities. It does not reach conduct that is 'wholly unilateral.'" (*Id.,* at p. 768 [81 L.Ed.2d at p. 641].)

The *Copperweld* court overruled many of its own decisions, including *Perma Life Mufflers, Inc.* v. *Int'l Parts Corp.* (1968) 392 U.S. 134 [20 L.Ed.2d 982, 88 S.Ct. 1981], relied upon by this court in MacManus's first appeal. In *Perma Life,* the court found common ownership would not shield the defendants from the obligations imposed on separate entities. That primary holding was discredited. But, said the *Copperweld* court, the *Perma Life* majority recognized "that '[i]n any event' each plaintiff could 'clearly' charge a combination between itself and the defendants or between the defendants and other franchise dealers." (*Copperweld* v. *Independence Tube Corp., supra,* 467 U.S. 752, 766 [81 L.Ed.2d 628, 640].) The *Perma Life* decision could be upheld, even under *Copperweld,* on such an alternative basis. This was precisely the ground for our ruling in *MacManus* v. *A. E. Realty Partners, supra,* 146 Cal.App.3d 275.[3]

REI cites *McGee* v. *First Federal Sav. & Loan Ass'n* (11th Cir. 1985) 761 F.2d 647 for the proposition that an illegal tying arrangement allegation is subject to summary judgment under *Copperweld.* Its reliance is misplaced. In *McGee,* the plaintiff applied for a real estate loan, the appraisal for which

---

[3] AERP and REI argue this theory was abandoned or not sufficiently pleaded in the complaint. However, in the interests of justice, the pleadings may be construed to include these alternate theories. The basis of MacManus's cause of action has been obvious from the inception of the controversy. Particularly in light of our previous holding in this matter, now the law of the case, we perceive no prejudice to the defendants.

was referred to the lending institution's wholly owned subsidiary. First, the plaintiff was not denied the right to shop among competitive marketers. Second, "[t]here are not two distinct products involved in the alleged situation. An appraisal is performed for the benefit of the lending institution. It is the 'consumer' of the appraisal product. There is no legitimate consumer demand by a borrower to purchase loan-related appraisal services separate from the purchase of the loan itself. Federal regulation requires *the lending institution* to commission the appraisal." (*Id.,* at p. 648.)

In order to implement the AERP/REI scheme, the acquiescence of a third party was necessary, namely the homebuyer. No interference with other escrow companies' access to the general homebuying public was implicated until MacManus sought to purchase an AERP home, allegedly conditioned upon his use of REI's services. It is the purchase agreement between AERP/REI and MacManus, or between AERP/REI and other coerced buyers, and the required arrangement between MacManus and REI that creates the illegal "combination" proscribed by the Cartwright Act.

For these reasons, we find *Copperweld* does not, under the circumstances here present, preclude a cause of action under California's antitrust statutes.[4] The court erred in granting summary judgment on the second cause of action.

### III

MacManus defined the class as consisting of those who "received title to an [AERP] home on or after August 25, 1978 [The operative date of Civil Code § 2995] and before January 1, 1982," using the AERP "offer to purchase form containing terms that may have the legal effect of requiring the purchaser to procure escrow services from REI" and the buyer did in fact procure "escrow services from REI."

---

[4] We, therefore, need not reach the broader issue extensively argued in the amicus brief, i.e., whether the *Copperweld* rule would apply to the Cartwright Act when the conspiracy or combination in restraint of trade is purely intra-enterprise and there is no coerced or unwitting compliance by the victim in the forbidden activity.

The summary judgment granted to AERP is not before us because AERP remains a defendant under Civil Code section 2995 and there is no final judgment as to it. The trial court may consider its ruling as to AERP an interim order (*George Ball Pacific, Inc.* v. *Coldwell Banker & Co.* (1981) 117 Cal.App.3d 248, 253 [172 Cal.Rptr. 597]) which "may be corrected at any time up to final judgment, even in the absence of newly discovered evidence." (*Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005, 1013 [183 Cal.Rptr. 594].)

In any event, AERP and REI have strongly contended they are not separate entities within the context of the Cartwright Act. Having joined themselves in alliance behind a single sword, they must now face its point together.

The court, after accepting affidavits, evidentiary documentation, and argument pursuant to the "Manual for the Conduct of Pretrial proceedings in Class Action," denied class certification.[5] It determined "[t]here are many rather obvious questions which have not been adequately answered by the moving party nor can they be assumed on the basis of the evidence presented" and concluded "whether a condition precedent did exist depends to a great extent on the buyer's understanding, which has to be inquired into on an individual basis. The expected number, in the class as envisioned by plaintiff, exceeds 4,000. Certification would not be fair to both parties, efficient or convenient to anyone . . . . The Court cannot find the commonality of issues or the superiority of the class which is required for certification."

Code of Civil Procedure section 382 provides for class actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." The class action manual outlines a detailed process governing pretrial hearings on certification. Tracking the California cases, it sets forth the issues to be addressed. ■ Essentially, "[a] class action is appropriate only when there exists a 'sufficient community of interest' in 'common questions of law and fact' so that proceeding in the class action form will result in 'substantial benefits both to the litigants and to the court.' (*City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 460 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].)" (*Hamwi* v. *Citinational-Buckeye Inv. Co.* (1977) 72. Cal.App.3d 462, 471 [140 Cal.Rptr. 215].)

MacManus's extensive declaration and attached exhibits filed in support of the motion for class certification indicate all potential members of the intended class were presented with purchase offers by AERP which contained language requiring them to sign escrow instructions to be presented by the seller. REI was not specifically named in the majority of them, but MacManus's declaration indicates over 99 percent of the escrows, opened in conjunction with the offers to purchase, were with REI.

In particular, MacManus attached copies of final subdivision public reports and offer to purchase forms, approved by the Real Estate Department, for several developments throughout California. The reports, in bold print, provided: "Buyer or Lessee Must Sign That He Has Received and Read This Report." They further contained a notice the seller had an interest in the escrow depository to be used.[6]

---

[5] The manual, prepared by Judges Thomas and Dowds for the Los Angeles County Superior Court, provided the procedural and evidentiary process used for the hearing pursuant to agreement of the court and the parties.

[6] When a new tract nears completion, the subdivider submits an application for a subdivision report, appending the purchase offer form proposed to be used, as required by state law.

The following residential developments provide examples of the reports and purchase forms employed. St. Francis Court, San Diego County, had a final report for 1974 (expiring 1979) which provided: "The escrow depository to be used is a wholly owned subsidiary of the subdivider." The offer to purchase stated, "Within Ten (10) Days from date of this agreement, Buyer will sign escrow instructions on the form provided by the Seller."

The Wellington, Orange County, 1977-1982 report states: "The subdivider has an interest in the escrow company which is to be used in connection with the sale or lease of lots in this subdivision." Its purchase offer provided: "Within ten (10) days from date of this Agreement, BUYER will sign escrow instructions on the form provided by the SELLER. On demand, BUYER will execute, and cause spouse to execute, all documents and furnish any information necessary to complete the sale." The Westwind, San Diego County, 1978-1983 report language was the same, as was its offer to purchase wording.

For Silver Ridge, San Bernardino County, the 1980-1985 report language was the same, but the purchase offer provided: "An escrow shall be opened and BUYER agrees forthwith upon receipt of escrow instructions . . . to join in such escrow by executing and depositing escrow instructions on forms provided."

The Homestead, Contra Costa County, 1979-1984 report language was the same, and the purchase offer stated: "The escrow holder will send you instructions for the sale of the property. You agree to sign the escrow instructions and return them to the escrow holder within five days from the day they are mailed to you."[7]

MacManus declared he had personally examined public records in the report folders on file with the Department of Real Estate. The questionnaire and application for the various public reports mentioned above specifically stated all purchase money would be handled through REI. MacManus had randomly examined grant deeds as recorded by AERP. In San Diego Coun-

---

The report then issues, noting the dates between which its pronouncements to prospective buyers are operative. If changes or amendments are made to the purchase offer form, they *must* be submitted for approval by the department.

[7]Sometime in 1981, AERP revised its offer to purchase forms, all of which included the following option for the buyer: "BUYER hereby designates and appoints that the Escrow Agent for the close of escrow in connection with the purchase shall be [blanks included for name, address, and phone number]. BUYER ACKNOWLEDGES IF REALTY ESCROW, INC. IS APPOINTED ESCROW AGENT (i) THAT REALTY ESCROW, INC. IS A CORPORATION WHOLLY OWNED BY SELLER, AND (ii) THAT IF BUYER DIRECTS THAT REALTY ESCROW, INC. ACT AS ESCROW AGENT HEREUNDER, BUYER HAS NOT BEEN REQUIRED BY SELLER TO USE THE SERVICES OF REALTY ESCROW."

ty, only 4 of the 736 used an escrow company other than REI, in Contra Costa County 84 of 86 used REI, and in Orange County, 33 of 33 were serviced by REI.

MacManus contends the purchase agreements are contracts of adhesion "containing terms that have an objective meaning." He insists construction of the agreements is a purely judicial function; thus, extrinsic evidence, such as answers to the questions posed by the trial court, is not required, citing *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51]. On this point, he is incorrect. We held, in *MacManus* v. *A. E. Realty Partners, supra,* 146 Cal.App.3d 275, "[w]hether a condition precedent existed as pleaded and whether the escrow instructions negated its existence are questions of fact to be resolved at trial." (*Id.,* at p. 284.) ▮ Nonetheless, the question remains whether those facts are common to all the proposed class members, or must be inquired into individually.

In *Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d 442, plaintiff instituted a class action against a lending institution for breach of contract and unfair trade practices seeking restitution of interest stated to be charged "per annum" which was in fact based on a 360-day year. The trial court dismissed the class action aspect of the suit, concluding "that, with respect to the prayer for monetary damages, 'the knowledge of each borrower . . . must be determined separately for each loan. . . .'" (*Id.,* at p. 446.) The Supreme Court affirmed as to the breach of contract cause of action. Each individual borrower would have to be examined as to his or her prior knowledge of the meaning of "per annum" in the agreement.

The same issues were *not* relevant to the unfair practices claim. "The general equitable principles underlying [Business and Professions Code] section 17535 as well as its express language arm the trial court with the cleansing power to order restitution to effect complete justice. Accordingly the statute clearly authorizes a trial court to order restitution in the absence of proof of lack of knowledge in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains." (*Id.,* at p. 449.) "[O]ur concern with thwarting unfair trade practices has been such that we have consistently condemned not only those alleged unfair practices which have in fact deceived victims, but also those which are likely to deceive them. [Citations.] We do not deter indulgence in fraudulent practices if we permit wrongdoers to retain the considerable benefits of their unlawful conduct." (*Id.,* at p. 451.) "Thus a class action may proceed, in the absence of individualized proof of lack of knowledge of the fraud, as an effective means to accomplish this disgorgement." (*Ibid.*)

The California Supreme Court, in *McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1983) 33 Cal.3d 816 [191 Cal.Rptr. 458, 662 P.2d 916], addressed a class action alleging violation of the usury laws. Compounding interest was proscribed unless the agreement clearly expressed such intention. The agreements at issue stated interest would be charged in accordance with the institution's "usual custom." The court had earlier held the term did not "on its face . . . clearly express an understanding that interest would be compounded." (*McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1978) 21 Cal.3d 365, 375 [146 Cal.Rptr. 371, 578 P.2d 1375, 18 A.L.R.4th 1050].) Upon remand, the trial court allowed extrinsic evidence indicating some members of the class understood compound interest would be employed, while others had no understanding at all. The class was decertified.

In the second appeal, the Supreme Court held extrinsic evidence could not be entertained to explain the borrower's understanding of the meaning. The court referred to its earlier decision in *Fletcher,* noting prior knowledge would preclude a breach of contract claim in the class format "because the individual issue of knowledge predominated over common questions." (*McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 33 Cal.3d 816, 821.) However, where a violation of statute is alleged, knowledge of the individual class members is no obstacle to certification. "Allowing a class action to proceed in the absence of individualized proof of lack of knowledge of the fraud is an effective method of accomplishing the disgorgement of property obtained by illegal means." (*Id.,* at pp. 821-822.)

In *Stephens* v. *Montgomery Ward & Co.* (1987) 193 Cal.App.3d 411 [238 Cal.Rptr. 602], the court reversed the denial of class certification to a plaintiff seeking to represent women excluded from managerial posts with Montogomery Ward. The court found certification particularly appropriate despite plaintiff's "inability at her deposition to identify other Wards employees who were denied promotional opportunities." (*Id.,* at p. 419.) She relied only on "statistical evidence revealing that certain departments are predominately managed by men . . . ." (*Ibid.*) Nonetheless, the court found the class sufficiently ascertainable. And, despite the company's insistence each store was responsible for its own personnel policies, the court found sufficient evidence of central administration to overcome any challenge to the commonality of issues. MacManus faces a much lower hurdle than the plaintiff in *Stephens.*

The separate transactions involved are also no bar to certification. There may still be "a finding of the requisite community of interest so long as every member of the alleged class would not be required to litigate numerous and substantial questions to determine his individual right to recover

subsequent to the rendering of any class judgment which determined in plaintiffs' favor whatever questions were common to the class." (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].)

Nor do the individual damage amounts present an insurmountable problem. "An individual member seeking damages merely supplies evidence of his particular purchases or transactions that determine his recovery. The unclaimed damages are usually applied by the court to aid the public consumer." (*Altman* v. *Manhattan Savings Bank* (1978) 83 Cal.App.3d 761, 769 [148 Cal.Rptr. 100], fn. omitted.) If the variance among the purchase offer forms proves burdensome, "this situation presents no obstacle. If expedient, the trial court may divide the class into subclasses." (*Occidental Land, Inc.* v. *Superior Court* (1976) 18 Cal.3d 355, 360 [134 Cal.Rptr. 388, 556 P.2d 750], fn. 3.)

Moreover, certification of the class is not embedded in cement. ■ "The trial court retains jurisdiction throughout the proceedings concerning class certification." (*Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 144 [191 Cal.Rptr. 849].) It can be decertified at any time, even during trial, should it later appear individual issues dominate the case. (*Grogan-Beall* v. *Ferdinand Roten Galleries, Inc.* (1982) 133 Cal.App.3d 969, 976 [184 Cal.Rptr. 411].)

The order dismissing REI as a defendant under the second cause of action[8] and the order denying the motion for certification as a class are reversed. Appellant to receive costs on appeal.

Crosby, J., concurred.

**TAYLOR, J.***—I respectfully concur in part, and dissent in part, in the result the majority reaches today.

### 1. *Cartwright Act Action*

I concur in reversing the order dismissing REI under the second cause of action because, as a result of the first MacManus appeal, it is law of the case

---

[8] MacManus does not, because we reverse on this issue, contest the refusal to allow his amendment asserting a common law conspiracy to violate Civil Code section 2995. He states, "the proposed first amendment to the third amended complaint . . . would be redundant if the statutory conspiracy (combination) under the Cartwright Act is permitted to go forward." Nor does he present argument in opposition to the dismissal of REI as to the first cause of action. Therefore, we affirm as to those orders.

* Assigned by the Acting Chairperson of the Judicial Council.

that a Cartwright Act action is stated whether or not AERP and REI operate as a single entity. The majority's analysis of the impact of *Copperweld* appears to be dicta, which should await decision in another case.

### 2. *Class Action*

I respectfully dissent from the reversal of the order denying class certification.

It is law of the case that the case's key issue (whether AERP required buyers to use the services of REI as a condition precedent to purchase) is a question of fact to be resolved at trial. (*MacManus* v. *A. E. Realty Partners* (1983) 146 Cal.App.3d 275, 284 [194 Cal.Rptr. 567].) I would hold that this requires separate proof as to each purchaser, precluding a class action. (*Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51].) This case does not involve violation of a statute thereby precluding the need for individualized proof of lack of knowledge of fraud, as the majority suggests; on the contrary, this case demands individualized proof of the nonfraud, contract-making facts surrounding each purchase transaction.

Deference should be given to the trial court's ruling denying certification. Trial courts are entitled to great discretion in the matter, and an appellate court should not disturb a ruling supported by substantial evidence unless improper criteria were used or erroneous legal assumptions were made. (*Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) Neither of those defects appears here. Substantial evidence supports the trial court's decision, and it should be upheld.

On November 25, 1987, the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied February 4, 1988.