[No. D008664. Fourth Dist., Div. One. Dec. 20, 1989.]

TRI-GROWTH CENTRE CITY, LTD., et al., Plaintiffs and Appellants, v.
SILLDORF, BURDMAN, DUIGNAN & EISENBERG et al., Defendants and Respondents.

1142

**1144**

**COUNSEL**

Goebel, Shensa & Beale, Goebel & Shensa, Louis E. Goebel and Cheryl Shensa for Plaintiffs and Appellants.

Procopio, Cory, Hargreaves & Savitch, Paul B. Wells, David A. Niddrie, Hansotte, Nostrand & Lange, Kenneth E. Lange, Jennings, Engstrand & Henrickson, Douglas R. Reynolds, Marilyn R. Moriarty and Richard J. Kerman for Defendants and Respondents.

## OPINION

**WORK, J.**—Tri-Growth Centre City, Ltd., and certain of its partners (hereafter referred to as Tri-Growth or plaintiffs) appeal a summary judgment in favor of the law firm of Silldorf, Burdman, Duignan & Eisenberg et al. (hereafter referred to as the law firm or defendants). Tri-Growth sued to impose a constructive trust and for damages alleging breach of fiduciary duty and interference with prospective economic advantage after the law firm purchased certain real property (1810 State Street) for which Tri-Growth was negotiating. We hold there are triable issues of material fact requiring reversal of the summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiffs Dallas Wilborn, R. W. Unander, John Carr, and Jeffrey Castellaw have been real estate investors over the years. Beginning in 1980, they formed a series of limited partnerships—designated numerically "Tri-Growth Investments I" and continuing through "Tri-Growth Investments XXIV"—which have acquired various parcels of property, primarily apartment buildings. Tri-Growth was formed by plaintiffs in June 1984. The numerically designated investment entities were unrelated to Tri-Growth, the latter which was formed to operate a motel.

Over the years, the law firm provided legal services to the plaintiffs as individuals, and to several of the numerically designated investment entities. However, the law firm never represented Tri-Growth in any legal matter.

In 1976 and 1980, Unander and Wilborn purchased certain parcels on the block bounded by State, Columbia, Elm, and Fir Streets in San Diego, which they later sold to Tri-Growth. A "private placement memorandum," making a private offering of limited partnership interests in Tri-Growth,

---

[1] Our summary of the facts is based on the evidence presented both in conjunction with defendants' motion for summary judgment and plaintiffs' unsuccessful motion for reconsideration. The motion for reconsideration—made before the entry of summary judgment—may be treated as a motion after an interim (rather than final) ruling, which gave the trial court discretion to grant or deny the motion even in the absence of newly discovered evidence. (See *MacManus* v. *A. E. Realty Partners* (1987) 195 Cal.App.3d 1106, 1112, fn. 4 [241 Cal.Rptr. 315]; *Blue Mountain Development Co.* v. *Carville* (1982) 132 Cal.App.3d 1005, 1013 [183 Cal.Rptr. 594].) It appears the trial court denied the motion for reconsideration on its merits after considering all the evidence, and thus on appeal we may consider the evidence presented at the motion for reconsideration without evaluating whether it was newly discovered. (See *George Ball Pacific, Inc.* v. *Coldwell Banker & Co.* (1981) 117 Cal.App.3d 248, 252-253 [172 Cal.Rptr. 597].) The parties do not contend otherwise.

states the partnership was formed "for the purpose of acquiring certain real property and thereafter constructing and operating a motel on the property." The partnership contemplated acquiring specified parcels on State and Fir Streets (including the Unander/Wilborn parcels and other parcels) on which a motel would be constructed. Further, the private offering notes the properties "are currently zoned as 'Central Business District' or 'CBD,' which usually permits construction of high rise structures. It is intended that the motel operation will permit the Partnership to retain these parcels for future development as the urban center of San Diego expands." Tri-Growth acquired the specified parcels and built a motel on the northern half of the block.

The property in dispute here, 1810 State Street, is adjacent to the properties purchased by Tri-Growth. There is no mention of 1810 State Street in the private offering memorandum or in the limited partnership agreement.

The private offering memorandum and the limited partnership agreement provide that partners may acquire other real property adjacent to or competing with the partnership's real property.[2]

In 1984 Scott Burdman, a partner in defendant law firm, became a limited partner in Tri-Growth.

Although some of the following factual allegations are disputed, all have sufficient support in the materials presented at summary judgment to be triable issues of fact.

Plaintiffs viewed Burdman's law firm as the attorney for the various numerically designated investment entities for which the firm had provided services, for as long as those partnerships continued in existence, available for consultation on any legal matters which arose.

The individual plaintiffs had been interested in acquiring all the property on the block since about 1979. They made unaccepted offers to purchase 1810 State Street in 1980 and 1983. During 1984 and 1985 after forming Tri-Growth, they concentrated on building the motel on the parcels they had acquired and did not actively pursue acquisition of 1810 State Street.

---

[2] Specifically, the private offering memorandum states: "Any Partner may acquire other real property interests adjacent to or competing with Partnership real property."

The limited partnership agreement states: "Any Partner may acquire other real property which competes, directly or indirectly, with the Property of this Partnership, and neither the Partnership nor a Partner shall have any right in or claim to the profits derived from such other real property."

However, acquiring all the parcels on the block became the goal of Tri-Growth once it was formed.

When Burdman was deciding whether to invest in Tri-Growth, he learned of the partnership's interest in acquiring the block and building a high-rise tower. In 1985, there was an informal discussion between plaintiffs and the law firm about the idea of jointly purchasing the 1810 State Street property and sharing the property for their respective offices, but the idea was not pursued.

In May 1986, Tri-Growth made an unsuccessful offer on the 1810 State Street property when the asking price was about $700,000. Plaintiffs then put the deal on the "back burner," believing no other developer would purchase the property since Tri-Growth owned other parcels on the block, and that the price and the terms made the purchase unfeasible for another user.

In May 1986, one of Tri-Growth's general partners filed for bankruptcy, causing credit problems for Tri-Growth particularly regarding a past due construction loan. Thus, in September or October 1986, when plaintiffs learned the price of the property had dropped to $595,000, it was not in a financial position to immediately negotiate for its purchase.

However, late in October 1986, it appeared Tri-Growth's financial problems were all going to be resolved; the bankruptcy court had approved the bankrupt general partner's conversion to a limited partner; and Tri-Growth had obtained a loan commitment from Imperial Bank to permanently finance the construction loan on the motel, which plaintiffs thought they would obtain either in late December or early January.

During this time period (late summer, early fall 1986), Burdman had been repeatedly calling Castellaw, aggressively questioning him about the problems with the bankruptcy and the status of the partnership. Castellaw assured Burdman the problems were being resolved and Tri-Growth's motel was doing well. Further, he told Burdman they were negotiating with the owner over the 1810 State Street property and were close to realizing their goal of putting the whole block under one ownership. Castellaw explained to Burdman in great detail how the price of the 1810 State Street property was coming down, and that even if it dropped so low that it became feasible for another user to purchase the property, Tri-Growth could still offer the highest price since Tri-Growth could develop a high rise on the block.

In late November or early December 1986, plaintiffs were informed the price for 1810 State Street had dropped to $550,000 and, since the partner-

ship's affairs were now sufficiently in order to accommodate a purchase, they set a meeting with the seller for December 12. On December 8 or 9, Burdman called Castellaw, and Castellaw told him the bankruptcy court had approved the deal pertaining to the bankruptcy, and Imperial Bank was drawing loan documents and they would record the loan in 1987. Burdman asked him how they were doing with their negotiations on the 1810 State Street property, and Castellaw told him they had it and were going on Friday to buy it and were going to try to arrange a closing date after the first of the year. Burdman told Castellaw his law firm had looked at the property, but one of the attorneys (Silldorf) thought it was too expensive. When Castellaw told him the price was a firm $550,000 and they had it, Burdman abruptly ended the conversation.

The purpose of the December 12 meeting was to assure the seller that plaintiffs wanted to buy the property. The seller with whom plaintiffs met on December 12 (Joseph Development Company) was acquiring the property from the current owner (Northview Corporation) as part of an exchange, and Joseph wanted to sell the property as soon as possible after closing escrow with Northview. The seller indicated he wanted to close escrow in 1986 if at all possible. Plaintiffs responded they could not get a loan that quickly, and the seller stated he might be willing to carry a short-term loan. When plaintiffs indicated they did not think it was physically possible to complete escrow that quickly (i.e., get the escrow documents typed, obtain a preliminary title report, prepare title insurance, etc.), the seller acknowledged that consideration. The seller did not make a 1986 closing date a condition of the sale, but rather merely wanted assurances he would be able to quickly sell the property after he closed escrow with the current owner. The seller did not suggest there would be a problem with a post-year-end closing, and indicated plaintiffs had the property. Plaintiffs were not concerned about losing the property because they did not think anyone could close before the end of the year.

At the December 12 meeting, plaintiffs made a commitment to the seller to buy the property. They did not view the seller as having made a commitment to sell to them, although they were given the impression that there were no other serious contenders for the property and that they had the property and would formalize the deal after the seller closed his escrow with the current owner. They were told a law firm had made an offer, but that it was loaded with contingencies and unlikely to fly. They were told they would be given the keys to look at the property the following week. When they were not able to contact, and were not contacted by, the seller's broker during the rest of December (an exceptionally hectic period for the real estate business) they assumed he was waiting until the new year to meet

with them and finalize a deal. Their agreement to purchase the property was not contingent on an inspection or on obtaining financing; the partnership was financially ready to immediately purchase.

■ ■ ■ ■ When first informed an unidentified law firm had bought the property, Castellaw suspected it might be Burdman's law firm, since in his view the only way someone could have beat them to the deal was if that person had obtained confidential information from Tri-Growth that the property had to be purchased immediately and that Tri-Growth was inclined to wait until after the first of the new year before closing.[3]

## ANALYSIS

■ Summary judgment may be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . [T]he court shall consider . . . all inferences reasonably deducible from the evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) The lack of a triable issue of fact may be established by inference only where the inference is the only reasonable one that can be drawn from the evidence for and against the motion. (*Taylor* v. *Fields* (1986) 178 Cal.App.3d 653, 659 [224 Cal.Rptr. 186].)

### POTENTIAL LIABILITY FOR BREACH OF FIDUCIARY DUTY[4]

First, we evaluate potential liability based on a violation of fiduciary duties arising from a partner and/or attorney/client relationship.

---

[3] Defendants' declarations depict the transactions and relationships differently than do Tri-Growth's. For instance, according to defendants, Burdman was never told Tri-Growth wanted to acquire the remainder of the block; a client referred the listing broker for 1810 State Street to the law firm; the broker told them the sale had to close before the end of the year; and Burdman told Castellaw the law firm was making an offer on the property. We are limited to construing the moving parties' papers strictly while giving a liberal construction to those submitted by Tri-Growth. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953].) Since none of defendants' declarations conclusively negate the triable issues of fact contained in Tri-Growth's documents, we related the factual background based on Tri-Growth's factual allegations. In doing so, we express no view as to the merits of plaintiffs' claims or as to whether they can be established to a trier of fact.

[4] Our analysis is premised on Burdman's conduct. Based on plaintiffs' facts presented in conjunction with the summary judgment motion, if Burdman improperly acquired and used Tri-Growth's confidential information, he did so on behalf of the law firm. Thus, any liability of the law firm is derivative of Burdman's liability. (See 9 Witkin, Summary of Cal. Law (9th

 A fiduciary or confidential relationship can arise when confidence is reposed by persons in the integrity of others, and if the latter voluntarily accept or assume to accept the confidence, they cannot act so as to take advantage of the others' interests without their knowledge or consent. (*Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 382[193 Cal.Rptr. 422].) The attorney/client relationship is a fiduciary one, binding the attorney to the most conscientious fidelity. (*Id.* at p. 383.) Similarly, when a partnership is created, the parties acquire rights and duties based on a fiduciary relationship. A partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation or concealment. (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 514 [189 Cal.Rptr. 377, 658 P.2d 740]; *McCain* v. *Phoenix Resources, Inc.* (1986) 185 Cal.App.3d 575, 579 [230 Cal.Rptr. 25]; see 9 Witkin, *supra*, § 31 et seq., at p. 428.)

## A.

Burdman argues he individually as a limited (as opposed to a general) partner can never have a fiduciary obligation to the partnership. Although we have found no case directly addressing the issue, we conclude the assertion sweeps too broadly. While a limited partner normally would not be involved in the management or otherwise participate in the partnership (see generally, 9 Witkin, *supra*, Summary of Cal. Law (9th ed. 1989) Partnership, § 61 et seq., at p. 450) so as to incur fiduciary obligations to other partners, we believe there can be factual scenarios where a limited partner might be involved in the partnership in such a manner—for example, allowing him access to confidential information—so as to create fiduciary duties. (See generally, *Mandell* v. *Centrum Frontier Corp.* (1980) 86 Ill.App.3d 437 [407 N.E.2d 821, 825, 831]; 9 Witkin, *supra*, Summary of Cal. Law (9th ed. 1989) Partnership, § 81, at p. 470; *McCain* v. *Phoenix Resources, supra*, 185 Cal.App.3d at p. 580.)[5]

---

ed. 1989) Partnership, § 44, p. 437.) The extent of the liability, if any, of any particular defendant named in the action (i.e., the law firm, the building partnership, the individual attorneys, their professional corporations, etc.) can be resolved at trial.

[5] The cases cited by Burdman do not support a contention there can be no fiduciary duty. (See, e.g., *People* v. *Zinke* (1987) 137 Misc.2d 463 [520 N.Y.S.2d 703], affd. as mod. *People* v. *Zinke* (1989) 147 App.Div.2d 106 [541 N.Y.S.2d 986] [general partner can be criminally liable for embezzlement of limited partner's funds]; *McCully* v. *Radack* (1975) 27 Md.App. 350 [340 A.2d 374] [authority of limited partners to bring action on behalf of partnership]; *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108 [81 Cal.Rptr. 592, 460 P.2d 464] [majority shareholders have fiduciary responsibility to minority and corporation].)

### B.

Burdman and the law firm each assert there can be no breach of duty based on the pre-existing attorney/client relationship with the Tri-Growth partners as individuals or with their other partnerships, because it is undisputed the firm never represented Tri-Growth. ■ However, an attorney's fiduciary duty can extend to former clients, to conduct not strictly pertaining to representation of a client, and to conduct with a nonclient which affects the relationship with a client. For example, a breach can arise when an attorney gains an unfair advantage over a former client by using confidential information acquired from the relationship (*David Welch Co.* v. *Erskine & Tulley* (1988) 203 Cal.App.3d 884, 891-892 [250 Cal.Rptr. 339]), or when an attorney engages in a personal relationship with the client to the client's detriment (*Barbara A.* v. *John G., supra,* 145 Cal.App.3d at pp. 383-384). ■ Further, conflict of interest concerns under the California Rules of Professional Conduct⁶ have been found to arise if an attorney is in a position to acquire confidential information from a nonclient which may be useful in the attorney's representation of a client (*William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1046-1048 [197 Cal.Rptr. 232]; see *Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 195 [242 Cal.Rptr. 196, 745 P.2d 917]), and when an attorney puts himself in a position, without client consent, where he may be required to choose between or reconcile his interests with a client's conflicting interests (*Hawk* v. *State Bar* (1988) 45 Cal.3d 589, 600 [247 Cal.Rptr. 599, 754 P.2d 1096]).

Thus, we are satisfied the evidence raises triable issues of fact as to whether these defendants breached a fiduciary duty to plaintiffs. In particular, Burdman was a partner in Tri-Growth and he (or his law firm) had provided legal services to Castellaw and the numerically designated Tri-Growth entities. ■ Further, there is a triable issue of fact as to whether Castellaw could have reasonably relied on Burdman's limited partnership status when disclosing Tri-Growth's confidential acquisition plans for 1810 State Street. In the unique context of the transaction involved here, there is a factual question as to the existence of a fiduciary relationship (*Barbara A.* v. *John G., supra,* 145 Cal.App.3d at pp. 383-385), and whether defendants breached it (*David Welch Co.* v. *Erskine & Tulley, supra,* 203 Cal.App.3d at p. 890).

---

⁶When evaluating whether an attorney has breached a fiduciary duty, the California Rules of Professional Conduct may be used to help define the scope of the attorney's duty to his or her client. (*David Welch Co.* v. *Erskine & Tulley, supra,* 203 Cal.App.3d at p. 890.)

## C.

We note the trial court's oral findings indicate that although it believed there may have been fiduciary duty in fact, the partnership documents specifically authorized the partners to compete with the partnership in the purchase of real property. We conclude the trial court incorrectly interpreted the written documents as resolving the factual issues in this case, when they in fact facially only permit all partners to acquire real property adjacent to or competing with Tri-Growth's real property.

■ Tri-Growth's private offering memorandum states "General Partners may, from time to time, organize other real property or Motel projects and offering and they have reserved the right to do so without claim from the Partnership or the other partners." Thus, if Burdman purchased 1810 State Street to compete with Tri-Growth's motel without using confidential information acquired solely by virtue of his status as a limited partner in Tri-Growth, the terms of the documents might well establish no breach of fiduciary duty. Here, however, a trier of fact could find Burdman knew the partnership was actively trying to purchase the same property, and that he used confidential information from Tri-Growth to usurp its opportunity to purchase that property. The act of acquiring property which is adjacent to or competes with partnership real property is distinct from the act of competing with the partnership in acquiring the same property, and distinct from the act of utilizing confidential information acquired from the partnership to give one partner an advantage over the partnership when competing for the same business opportunity. In short, the partnership documents do not resolve the otherwise triable issue of fact as to whether Burdman breached a fiduciary duty.

■ According to the evidence presented by plaintiffs, Burdman used his attorney and partnership position to acquire confidential information that Tri-Growth would have its financial problems resolved by late December 1986 or early 1987, would be meeting with the seller and making an offer in December, and would be in a position to finalize a purchase of the 1810 State Street property in early 1987 and if necessary to pay a high price based on the return it could obtain from a high-rise development on the entire block. Further, Burdman misled Castellaw by telling him his firm had looked at the property but thought it was too expensive. From these facts it reasonably can be inferred that Burdman utilized the information about Tri-Growth's plans to compel his law firm to finalize the offer immediately and close escrow before the end of the year to prevent Tri-Growth from obtaining this property. Armed with knowledge that Tri-Growth was not going to try to close before the end of the year, Burdman's firm could

induce the seller to accept its offer by satisfying the seller's desire to sell the property as quickly as possible. Further, aware it might attempt to close before December 31 if it learned of the law firm's interest, Burdman did not alert Tri-Growth, but proceeded to use Tri-Growth's confidential information to allow his firm to make a successful offer.

Plaintiffs specifically argue that defendants breached fiduciary duties by (1) failing to disclose that the law firm was making a competing offer on the property, thereby depriving Tri-Growth of an opportunity to better the firm's offer, and (2) using Tri-Growth's confidential information to give the law firm a competitive advantage. We have concluded that (1) under some special circumstances limited partners might place themselves in a fiduciary relationship to the general partnership and an attorney might owe a duty to a former client in a transaction not directly pertaining to the representation, and (2) sufficient facts have been presented to create a triable issue of fact as to whether defendants breached such duties. We need not further define the precise parameters of the conduct which could constitute breach of fiduciary duty under the particular facts of this case; this is a factual issue properly resolved at trial. (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 32 [216 Cal.Rptr. 130, 702 P.2d 212]; *David Welch Co.* v. *Erskine & Tulley, supra*, 203 Cal.App.3d at p. 890; *Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 276 [132 Cal.Rptr. 222].)

### POTENTIAL LIABILITY FOR INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

■ The tort of interference with prospective economic advantage consists of improper methods which interfere with another's prospective business advantage and which are not within the privilege of fair competition. (*Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18 [144 Cal.Rptr. 664, 6 A.L.R.4th 184]; see *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 808 [157 Cal.Rptr. 407, 598 P.2d 60] [negligent interference]; see 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 652 et seq., p. 740.) The tort does not require interference with a relationship which has ripened into a contract, but merely requires one which has such a potential; it is a question of fact whether the business relationship between the plaintiff and third party is sufficient to support the tort. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 822, 830, fn. 7 [122 Cal.Rptr. 745, 537 P.2d 865].) Under the privilege of free competition, a competitor is free to divert business to himself as long as he uses fair and reasonable means. (See *id.* at p. 828.) Thus, the plaintiff must present facts indicating the defendant's interference is somehow wrongful—i.e., based on facts that take the defendant's actions

out of the realm of legitimate business transactions. (See *Rickel* v. *Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 658, 660 [192 Cal.Rptr. 732].)

■ Here, as stated, plaintiffs presented facts asserting defendants acquired and used the confidential information from Tri-Growth which allowed the law firm to offer an earlier closing date and ensure its offer rather than Tri-Growth's was accepted. These factual contentions support a cause of action against defendants for interfering with prospective economic advantage as well.

CAUSE OF ACTION FOR IMPOSITION OF A CONSTRUCTIVE TRUST

■ A constructive trust is an equitable remedy preventing unjust enrichment, compelling the restoration of property to another when it has been acquired through fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful conduct, unless the holder has some other or better right to the property. (*David Welch Co.* v. *Erskine & Tulley, supra,* 203 Cal.App.3d at p. 894; Civ. Code, §§ 2223, 2224.) ■ On the facts alleged, there is a triable issue of fact whether the property was acquired through wrongdoing, and whether equity requires it be transferred to Tri-Growth.

■ Finally, we reject defendants' argument the individual plaintiffs (as opposed to Tri-Growth) do not have standing to sue because they assert their personal damages in their declarations and deposition testimony, but not in the allegations of the complaint. A motion for summary judgment is not a substitute for demurrer, and since their personal losses are factually presented and within the general area of the issues framed by the pleadings, their standing is not defeated by the motion for summary judgment. (See *Mason* v. *Superior Court* (1985) 163 Cal.App.3d 989, 997 [210 Cal.Rptr. 63].)

DISPOSITION

The judgment is reversed.

Kremer, P. J., and Wiener, J., concurred.

A petition for a rehearing was denied January 18, 1990, and respondents' petition for review by the Supreme Court was denied April 4, 1990. Panelli, J., was of the opinion that the petition should be granted.