[No. H035038. Sixth Dist. July 18, 2011.]

MISSION WEST PROPERTIES, L.P., et al., Plaintiffs, Cross-defendants and Appellants, v.
REPUBLIC PROPERTIES CORPORATION et al., Defendants, Cross-complainants and Respondents.

## COUNSEL

Allen Matkins Leck Gamble Mallory & Natsis, Robert R. Moore and Michael J. Betz for Plaintiffs, Cross-defendants and Appellants.

Curtis & Green, Mitchell J. Green; Fettmann, Tolchin & Majors and Edward J. Tolchin for Defendants, Cross-complainants and Respondents.

## OPINION

**ELIA, J.**—After a court trial, appellants Mission West Properties, L.P., and Mission West Properties, Inc., failed to recover on their complaint for breach of a partnership agreement, breach of fiduciary duty, and related causes of action, while respondents, their partners, recovered on their cross-complaint for reciprocal claims. Appellants assert both substantive and procedural errors in the trial court's legal and factual conclusions. We will affirm the judgment.

## *Background*[1]

Appellants and respondents were partners in the Hellyer Avenue Limited Partnership, abbreviated by both sides as HALP. Appellant Mission West Properties, L.P. (MWLP), owned a 50 percent interest in HALP and was HALP's general managing partner. The general partner of MWLP was appellant Mission West Properties, Inc. (MWI), which operated as a publicly held real estate investment trust. Carl Berg was the president of MWI. His construction management company, Berg & Berg Enterprises (Berg & Berg), is also an appellant, but it was not one of the original partners in HALP.

The other 50 percent of HALP was held by respondents Republic Properties Corporation (Republic Properties), 1 percent; Steven A. Grigg, its president, 3.6 percent; David L. Peter, its executive vice-president, 1.25 percent; and Mentmore Partners, LLC (Mentmore Partners), 44.15 percent.

Stellex Industries, Inc. (later known as Stellex Technologies), operated through two principal subsidiaries, Stellex Electronics Systems, Inc. (Stellex Electronics), and Stellex Aerostructures, Inc. Stellex Electronics in turn had several subsidiaries, including Stellex Microwave, the center of the present controversy. Mentmore Holdings Corporation owned Stellex Technologies and provided management services to the various Stellex subsidiaries.

While seeking a new location for its facility, Stellex Microwave found 5300 Hellyer Avenue, and retained Republic Properties to acquire the property, develop it for Stellex Microwave's specialized use, and lease it back to Stellex Microwave. The property at that time was owned by a Carl Berg affiliate, BB & K.

In late 1998 or early 1999 Republic Properties contracted with BB & K to buy the property. Republic Properties could not obtain financing, however, so it proposed to Berg that they engage in a joint venture. Berg and Republic Properties agreed to create HALP and lease the property to Stellex Microwave.

Drafting of the HALP limited partnership agreement (LPA) took place between April 1999 and July 2000, when it was finally signed, with an effective date of May 15, 2000. Meanwhile, on June 30, 1999, Berg and Grigg, on behalf of the anticipated HALP, executed a lease of the property to Stellex Microwave. Among the provisions of the lease was section 15.1, which stated that an "Event of Default" would occur if the failure to pay rent

---

[1] As do the parties on appeal, we will rely in part on the trial court's statement of decision in summarizing the history of their dispute. (Cf. *Martin Brothers Construction, Inc. v. Thompson Pacific Construction, Inc.* (2009) 179 Cal.App.4th 1401, 1405, fn. 1 [102 Cal.Rptr.3d 419].)

or other required payment was not cured within five days of written notice of default. Correspondingly, the LPA included section 6.05, which allowed dilution of respondents' interests should an Event of Default occur under the lease between Stellex Microwave and HALP.

After signing the lease with Stellex Microwave, HALP hired Berg & Berg to construct the specialized improvements. Under Carl Berg's personal supervision of the construction, the buildings were ready for occupancy by June 12, 2000. Stellex Microwave began paying rent, and Berg, as president of MWI (the general partner of MWLP), made distributions of rental income to the HALP partners in June, July, and August of 2000 in accordance with the LPA.

Berg & Berg had agreed to bill Stellex Microwave for the entire project upon its completion. Because some construction work remained to be performed when Stellex Microwave took occupancy, however, Berg & Berg could not determine the final amount owed for tenant improvements until August. At that point, Stellex Microwave owed Berg & Berg about $10.5 million, due on August 25, 2000.

On August 21 or 22, 2000, Bradley Jay, vice-president of finance for Mentmore Holdings Corporation, informed Carl Berg that Stellex Microwave would be unable to pay for the tenant improvements on August 25. Berg asked about the nature of the delay and when he could expect payment. Jay explained that Stellex Technologies had been trying to resolve its financial difficulties by selling assets and it needed Berg's cooperation. Berg asked whether Jay could procure or guarantee some amount of money while he discussed the situation with his bankruptcy attorneys. Berg also requested the letter of credit that Republic Properties was holding as security for Stellex Microwave's performance under the lease.[2]

On August 30, 2000, HALP (represented by Berg) and Stellex Microwave executed an agreement extending the time for Stellex Microwave to pay for the tenant improvements until September 15, 2000. It also allowed HALP to draw on the letter of credit to reduce Stellex Microwave's obligation by $2 million. Berg subsequently did draw on the letter of credit, thereby reducing the debt to Berg & Berg to $8.5 million. Among the terms of this new payment agreement was a provision for a further two-week extension (to Sept. 29) in the event that Stellex Microwave sold certain assets. If Stellex Microwave failed to make a timely payment by either of these deadlines, it was entitled to two business days "after receipt of written notice within which

---

[2] The lease between HALP and Stellex Microwave permitted Stellex Microwave to provide a $2 million letter of credit in lieu of a security deposit in cash.

to cure such default." This provision replaced the original notice provision in the lease, which allowed five days after Stellex Microwave received written notice of default.

Meanwhile, beginning September 1, 2000, Berg withheld distribution of the rental income to respondents. At trial Berg testified that he "diluted" or "removed" respondents from the partnership five days after the August 21 or 22 conversation with Jay, in the belief that when the "five-day cure period was up," an Event of Default occurred under the LPA, causing an expulsion. He did not believe that notice was required for an Event of Default to occur. Berg reassigned respondents' partnership interests to Berg & Berg.

On September 12, 2000, Stellex Microwave filed for chapter 11 bankruptcy protection. On January 11, 2001, over HALP's objection, the bankruptcy court entered an order approving the purchase by Tyco Acquisition Corp. XIV (Tyco) of Stellex Microwave's assets, including the HALP lease, the construction agreement, and the August 30, 2000 payment agreement. All obligations under these contracts would be assumed by Tyco and defaults would be deemed cured. The sale would be binding on all creditors and other third parties, including "all persons asserting Interests in the Transferred Assets . . . ."

On February 2, 2001, Stellex Microwave paid Berg & Berg $8,341,412, the amount Stellex Microwave had received from Tyco. Stellex Microwave had continued paying its rent during the entire bankruptcy period, and Tyco continued to pay the rent on time; but Berg did not make any distributions of the income after August 2000. The lease was subsequently assigned to Cobham plc in an "Assignment of Lease and Landlord's Consent." The parties to that document agreed that the lease was valid and enforceable, and that the assignor (M/A-COM, Stellex Microwave's successor) was not in default.

MWLP and MWI filed their complaint in this action on February 26, 2001, requesting declaratory relief, a constructive trust, and damages for breach of fiduciary duty, concealment, and breach of the partnership agreement and the covenant of good faith and fair dealing. Appellants generally alleged that Republic Properties and its officers, Steven Grigg and David Peter, along with Mentmore Partners, had failed to disclose Stellex Microwave's financial condition before forming HALP. The action was stayed, however, because a related action brought by respondents was already pending in Maryland. The judgment for respondents in that case was eventually vacated for lack of personal jurisdiction over MWLP.

In July 2006, after the stay in the present action was lifted, respondents filed a cross-complaint against appellants, alleging that appellants' failure to

make monthly income distributions constituted a breach of contract and breach of fiduciary duty. In an amended cross-complaint filed in November 2006, respondents added HALP and Berg & Berg as cross-defendants. Respondents sought damages, specific performance, a constructive trust, declaratory relief, and dissolution of the partnership.

The matter was tried by the court between February 24 and March 5, 2009. After issuing a tentative decision and a statement of decision, on September 17, 2009, the court entered judgment for respondents on both appellants' complaint and the cross-complaint, granting declaratory relief and damages to respondents for breach of the LPA. After unsuccessfully moving to vacate the judgment and for a new trial, appellants brought this appeal.

## Discussion

Appellants' contentions on appeal initially focus on the assertion that the LPA entitled them to dilute respondents' partnership interests due to Stellex Microwave's default on the payment for tenant improvements. Appellants specifically contest the trial court's determination that respondents were not liable for breach of the LPA or breach of fiduciary duty. As to the cross-complaint, appellants maintain that respondents were barred from recovering by the applicable statutes of limitations and the doctrine of res judicata.

Appellants urge this court to review most of the court's rulings de novo, while respondents insist that "every material matter" in this case consists of a factual dispute subject to a review for substantial evidence.[3] To the extent that interpretation of the relevant contract provisions is in dispute, we perform that function independently of the trial court; but review of the lower court's findings of fact is governed by the substantial evidence rule. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266 [35 Cal.Rptr.3d 343]; *Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1558 [5 Cal.Rptr.2d 394].) Here, however, the issues presented on appeal mainly concern not the meaning of the language used in

---

[3] Citing Code of Civil Procedure section 634, appellants complain that the court's statement of decision was inadequate, and therefore this court should not infer that the trial court resolved *any* of the controverted issues in respondents' favor. They misleadingly represent, however, that they brought all of the asserted inadequacies to the attention of the trial court, as the cited statute requires. The record discloses that they objected to the lack of findings on only the allegation of concealment, in their motion to vacate the judgment. On that issue the court determined that any information respondents knew was known or should have been known by Berg as well. In any event, the record contains no request specifying the controverted issues appellants wished to be covered in the anticipated statement of decision, as required by Code of Civil Procedure section 632.

the agreements, but whether any party's conduct violated one of the applicable provisions. Accordingly, our primary task is to determine whether the trial court's resolution of these conflicts was supported by substantial evidence in the record.

### 1. Dilution of Respondents' Interests in HALP

Section 6.05 of the LPA between the parties pertained to dilution of partnership interests. Appellants relied on this provision when they "expelled" respondents from the partnership five days after Bradley Jay told Berg that Stellex Microwave was unable to pay for the tenant improvements. Appellants continue to justify their conduct by resorting to this dilution clause, along with the payment agreement they executed after Jay's disclosure.

Section 6.05 of the LPA provided, in relevant part: "The capitalized terms appearing in this Section 6.05 which are not otherwise defined herein shall have the meanings ascribed to those terms in the Stellex Lease. Notwithstanding any provision to the contrary contained in this Agreement, should an Event of Default arise under the Stellex Lease due to the failure of Stellex to make the payments required thereunder, which is not subsequently cured . . . in such event the Partnership Interests owned by [Republic Properties] and the Limited Partners . . . shall be subject to certain dilutions as follows . . . ." The lease defined an Event of Default to include "Default in the payment when due of any installment of rent or other payment required to be made by Tenant hereunder,[4] where such default shall not have been cured within five (5) days after written notice of such default is given to Tenant."

One of the trial court's critical findings was that appellants had no contractual right to dilute respondents' interests in HALP because (1) no Event of Default had occurred to justify dilution and (2) the default in payment for tenant improvements was cured by the bankruptcy court's order approving the sale to Tyco. With regard to the first conclusion, the court first noted that there was no invoice listing the $10.5 million as due on August 25, 2000. Nevertheless, assuming that was the payment date, the court found that the August 30, 2000 payment agreement extended the date to September 15, 2000. Secondly, the court noted that HALP had not given its tenant, Stellex Microwave, *written notice* of its default. Such notice was "critical. It is an important step on the path to termination of the lease. There can be many reasons why a landlord would choose to work with a tenant to avoid a default, and then upon default choose not to exercise the right to declare in writing that the default exists, and choose not to force the tenant by written

---

[4] Those payments included "all labor and services performed for, materials used by or furnished to, Tenant or any contractor employed by Tenant with respect to the Premises."

demand to cure the default or suffer termination of the lease." In this case, the court observed, Berg had suggested language in which Stellex Microwave would acknowledge default, but Stellex Microwave had rejected it, and it did not appear in the payment agreement. Instead, Stellex Microwave acknowledged its debt, both parties acknowledged the new deadline of September 15, 2000, and both understood that Stellex Microwave would be entitled to cure its default within two business days after receiving "written notice within which to cure such default (in lieu of the five (5) day period provided in paragraph 15.1(a) of the lease agreement)." The court also reasoned that no written demand could have been made regarding the September 15 default because Stellex Microwave had filed for bankruptcy three days earlier, thereby triggering a stay.

The court's conclusion is fully supported by the evidence presented at trial in light of the contract provisions at issue. Section 6.05 of the LPA expressly directed the reader to the definition of "Events of Default" contained in the lease between HALP and Stellex Microwave. Under the lease, there could not be an Event of Default unless Stellex Microwave received written notice of its failure to make a payment when due *and* failed to cure that default within five days after receiving written notice of that default. If payment for tenant improvements was indeed due on August 25, 2000 (a fact questioned by the trial court), then appellants should have given Stellex Microwave written notice of its default. Instead, it agreed to extend the payment deadline to September 15. As Stellex Microwave's bankruptcy occurred before that date, no further action could have been taken to recover the $10.5 million until the bankruptcy court lifted the stay.

Appellants protest that an Event of Default actually occurred on August 27, five days after Jay notified Berg that Stellex Microwave would be unable to make the August 25 payment. Appellants insist that Berg treated Jay's disclosure as an anticipatory breach, which was not cured within five days, thereby creating an Event of Default. As a result, section 6.05 of the LPA made Republic Properties's partnership interest subject to dilution, reducing Republic Properties to a limited partner. Appellants maintain that the cashing of the letter of credit demonstrates that "there was [already] a default under the lease," because that redemption could be done only upon a default under the lease. That assertion misstates the conditions of all the relevant documents, however. Under the letter of credit, the $2 million could be drawn if Stellex Microwave was "in default beyond the expiration of any applicable grace period *under the terms and condition* [*sic*] *of the lease . . . .*" (Italics added.) Under the lease, written notice of any default was first required, followed by five days in which to cure the default. Even setting aside the subsequent modification of those terms in the payment agreement (giving Stellex Microwave the extension plus two days after default), we cannot overlook the plain terms of the contract. Because Stellex Microwave was not

given written notice of what Berg regarded as its default, no Event of Default may be said to have occurred five days after payment was due.

Appellants insist that written notice was not required because Stellex Microwave already knew that it was in default, so giving notice would have been an unnecessary idle act. They further argue that "by its conduct" Stellex Microwave waived the requirement of notice, because it was Stellex Microwave that **"gave notice to Appellants** that i[t] was in default." These arguments are not supported by the evidence credited by the trial court, however. Although Berg testified that Jay told him Stellex Microwave would be unable to pay for the tenant improvements, the trial court admitted Jay's deposition testimony in which he stated that in the same conversation, he asked Berg to wait until Stellex Microwave could sell some assets to "make [Berg] whole." The result was an extension of the payment due date to September 15. Moreover, Stellex Microwave could not have given notice of its default in the August 22 conversation, because it was not in default at the time; payment was not yet due. No Event of Default having occurred by August 30, 2000, appellants were not entitled to invoke section 6.05 of the LPA to dilute respondents' partnership interests.

Appellants further challenge the trial court's conclusion that Stellex Microwave's bankruptcy petition and resulting stay protected Stellex Microwave from any demand to cure. Appellants contend that this event was irrelevant because respondents were "properly expelled" before the bankruptcy. As we just concluded, that assertion is without merit. Alternatively, appellants argue that any protection afforded to Stellex Microwave did not extend to respondents, whose rights under the LPA were unaffected by the bankruptcy. This misses the trial court's point. Because the September 12 petition rendered HALP unable to enforce the new payment provision by supplying written notice of Stellex Microwave's default, no Event of Default could have occurred, and therefore dilution was not an available remedy under the LPA. In any event, as discussed above, appellants did not even attempt to provide the required written notice pertaining to either of the due dates.

Without an Event of Default, dilution was not permitted under section 6.05 of the LPA. It is therefore unnecessary to address the third and fourth grounds of the trial court's decision, that the default was cured by the sale to Tyco in the bankruptcy proceeding and that full dilution would constitute an unjust forfeiture.

2. *Breach of Fiduciary Duty and Concealment*

Appellants next contend that respondents' partnership interests were properly diluted based on their breach of fiduciary duty. In their view, respondents' concealment of the financial condition of Stellex Microwave and Stellex

Technologies constituted a breach of fiduciary duty under common law, under Corporations Code section 16601,[5] and under the LPA.[6] Appellants' claim of breach rests on the allegation that respondents "failed to disclose the information concerning [Stellex Microwave's] financial condition during the discussions concerning the formation of the Partnership or any time after the formation of the Partnership, despite having information that was critical to Plaintiffs' decision to enter into the Partnership or remain in the Partnership." Appellants alleged that if they had known about Stellex Microwave's "financial problems," "they would not have formed a partnership with Defendants" and would not have distributed more than $524,000 to respondents.

Appellants' reliance on section 16601 is misplaced. The focus of this challenge is simply that section 16601 does not require proof of damages; consequently, it was immaterial that they failed to prove damages at trial. It is unnecessary to address this point, however. Aside from damages, a breach of fiduciary duty, whether by statute[7] or common law, requires the existence of the duty and the breach. (See *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 524 [81 Cal.Rptr.3d 387] [delineating elements of cause of action].) Even if all respondents owed a fiduciary duty to appellants, a point vigorously disputed by respondents,[8] the trial court found that no breach had occurred.

Substantial evidence supports that conclusion. Berg had been a Silicon Valley real estate developer for more than 40 years. When a partnership was

[5] All further statutory references are to the Corporations Code except as otherwise specified.

[6] Section 17.01 of the LPA, while poorly drafted, clearly attempts to protect partners from liability for reasonable acts undertaken in good faith. Not protected are "acts or omissions constituting fraud, willful misconduct or material breach of this Agreement or fiduciary duty." Section 9.02 of the LPA emphasizes that a partner does not waive any rights or remedies arising from another partner's violation of the agreement of "any fiduciary duty owed by such other Partner under law."

[7] Section 16404 describes the fiduciary duties of a partner to the partnership and the other partners as "the duty of loyalty and the duty of care," which are themselves defined further in the statute. Section 16403, also relied on by appellants, provides for access by partners to books and records of the partnership and requires each partner to furnish to the other(s) information related to the business and affairs of the partnership.

[8] Under section 15903.05, subdivision (a), a *limited* partner "does not have any fiduciary duty to the limited partnership or to any other partner solely by reason of being a limited partner." Among respondents, only Republic Properties was a general partner, albeit with only a 1 percent interest, and it had no management responsibility. Grigg, Peter, and Mentmore were all designated in the LPA as limited partners. In general, the absence of any responsibility for management of partnership business makes it unlikely that a partner will incur a fiduciary duty to the partnership and partners. (See *Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1150 [265 Cal.Rptr. 330] [but noting conceivable scenarios in which such duty could arise, as in acquisition of confidential information].) The cases cited by appellant pertain to the fiduciary duties of a *general* partner. (See, e.g., *BT-I v. Equitable Life Assurance Society* (1999) 75 Cal.App.4th 1406, 1412 [89 Cal.Rptr.2d 811] [general partner retains business-related fiduciary duties in limited partnership].)

proposed by Grigg and Peter, Berg was hesitant, as he had had "a very bad experience" with a similar partnership in which the tenant went bankrupt. Berg told them that he would need "financials" and other information about the company to determine whether it was a viable tenant. He believed that Stellex Microwave was owned by Mentmore so that it was unnecessary to discover whether there existed a Stellex Industries. He knew that it was very difficult to obtain information about private technology companies, so he used someone he knew and trusted to investigate Stellex Microwave. In his deposition Berg testified that he "certainly did a lot of investigation" of Stellex Microwave himself and "felt very comfortable" with that company. David Peter testified that Berg did not specifically request "financials" from Mentmore; "[i]n fact, he . . . basically said he would handle that himself because he was certainly capable of doing his own research. In fact, he said he didn't really trust anybody else to do it and he would do it himself." Peter also stated that he directed Berg to specific people at Stellex to enable him to "conduct his due diligence," including "the people who were running Stellex Microwave Systems." The "financials" were publicly available, Peter explained, from the Securities and Exchange Commission (SEC) and on an online database called "Edgar" which was accessible to "anybody in the world." According to Peter, Berg had talked about using Edgar "all the time," as he had interests in "dozens of public companies and served on lots of boards." At trial Berg confirmed that he did research on public companies almost every day, "probably on Edgar." He obliquely stated, however, that he did not use Edgar for Stellex because he did not know that Stellex was a public company.

Berg nevertheless believed that Grigg and Peter should have told him about the structure of Stellex; "[i]f they would have [sic] done that and would have [sic] indicated to me that there was some other kind of structure, it would have been automatic for us to want to have that party involved in the lease either as a guarantor or on the lease. And we would have also questioned how Mentmore and these people were able to acquire the rights to this asset. And so those are two things that are very fundamental in what we do in our business. And if I would have [sic] had any knowledge of that at any time, those two issues would have [sic] been brought up, I would have asked them for documentation to show me how Republic and Mentmore got the rights to even enter this agreement."

The trial court found, however, that Berg did know about the relationship between Stellex Microwave and Stellex Industries. Berg was "a very sophisticated investor and real estate developer, with over 40 years experience in the field. He could have asked questions, if he didn't, and he could have consulted the [I]nternet. Stellex Industries maintained a website. Although Stellex Industries was privately owned, its bonds were publicly traded, and it was required to file 10-Q's and 10-K's with the SEC which were readily

available on the Edgar website . . . . [¶] The 10-Q's and 10-K's reveal the financial condition of Stellex Industries and its subsidiaries, including Stellex Microwave."

The trial court also found that respondents did not know any more than appellants did (or could have discovered through SEC filings) about Stellex Microwave's troubles. Stellex Technologies, the parent company, had met its "considerable debt" obligations through 1999, but encountered difficulties in the first quarter of 2000 due not only to a reduction in orders for parts from an important customer but also to an accounting fraud in an acquisition. Stellex Industries missed a bond interest obligation in March 2000, and after it defaulted on its debt in May 2000, it was unable to obtain credit. A sale of Stellex Aerostructures then fell through. The trial court pointed out that these events, which "transpired in fairly rapid succession," occurred while the tenant improvements were being completed. Thus, "[t]here was nothing that plaintiffs could have done" had they known about the financial reverses of early 2000. Furthermore, it would not have advanced appellants' position to attribute the knowledge of owners and officers of Mentmore to Republic Properties, since even Mentmore itself did not know "until too late that Stellex Microwave would not be able to pay Berg & Berg for its tenant improvements."

Appellants nonetheless insist that section 16403 imposed the "affirmative obligation" on respondents to provide appellants with "any information concerning the partnership's business **without demand**." Section 16403 is not helpful. As noted, the court found, based on the evidence presented at trial, that respondents did not have information appellants could have used before the tenant improvements were completed. The parties stipulated at trial that there was nothing at that time that would have caused Berg not to sign the lease with Stellex Microwave. The court had before it financial reports disclosed to the SEC during the relevant period in 1999 and 2000. Berg himself could point to nothing he had learned over the course of the litigation to indicate that in June 1999 any of the Stellex companies were having financial problems. Even as late as August 2000, when it disclosed its difficulty generating the cash to pay Berg & Berg, Stellex Microwave believed it could sell assets to pay for the tenant improvements. Stellex Microwave continued paying rent on the property during the entire lease period.

Thus, notwithstanding appellants' reference to testimony they believe supports a different conclusion, the court's determination that respondents did not fail to disclose known information is supported by substantial evidence. And while appellants now assert that Berg had no obligation to investigate the financial health of Stellex Industries or its subsidiaries, he was fully aware

that it was necessary to do so before entering into a partnership agreement predicated on business with Stellex Microwave; and he in fact did perform that investigation. Nothing available to the parties alerted them to the trouble that lay ahead for Stellex Microwave.

## 3. *Concealment*

Our conclusion regarding the concealment claim is the same as for breach of fiduciary duty, since both claims point to the same act: respondents' alleged concealment of material financial information about Stellex Microwave. The only difference in appellants' concealment argument on appeal is the assertion that the trial court did not rule on this cause of action. While there is no separate heading for concealment in the court's statement of decision, it unequivocally rejected appellants' "claim that they were tricked into granting partnership interests to Republic Properties and the limited partners, who concealed from them (a) the ownership structure of Stellex Technologies, (b) the poor financial condition of the Stellex entities, and (c) the inability of Stellex Microwave to pay for tenant improvements." Appellants' challenge of the trial court's factual findings fares no better when presented in the context of concealment.

## 4. *The Cross-complaint*

In their cross-complaint respondents alleged breach of contract, breach of fiduciary duty, conversion, and unjust enrichment. They sought damages, specific performance, a declaratory judgment and constructive trust, and dissolution of HALP or dissociation of MWLP from the partnership. The cross-complaint originally named only MWLP and MWI as defendants, but the trial court sustained appellants' demurrer on the ground that HALP and Berg & Berg were necessary parties. Accordingly, in their amended cross-complaint respondents added these two entities as defendants. The trial court's statement of decision reflects its finding that appellants did breach the LPA and were entitled to declaratory judgment, but it rejected the other claims in respondents' cross-complaint.

In their first demurrer appellants argued that HALP and Berg & Berg, though "necessary and indispensable parties," nevertheless could not be sued because the applicable statutes of limitations barred recovery from them. Finally, appellants invoked the judgment in the Maryland action to argue that as to MWI, the entire cross-complaint was barred by res judicata. In their subsequent demurrer to the amended cross-complaint, appellants again raised these defenses. On both occasions, however, different judges of the superior court found that respondents' action was not barred by the statute of limitations, because the action had been stayed during the pendency of the

Maryland action, thus tolling the running of the limitations periods. Res judicata was inapplicable, the court explained, "because there was no final judgment on the merits regarding non-jurisdictional issues in the Maryland action."

Appellants first repeat a one-paragraph argument in their posttrial brief to contend that respondents had "no right" to enforce the LPA. The logic in this argument is difficult to comprehend: "It is undisputed that a contract cannot be enforced by a party lacking authority to enter into the same contract. [Citations.] Stellex's lenders possessed a security interest over all of Stellex's assets, including the Lease. As Respondents failed to provide any evidence that those lenders waived their ability to enter into the HALPA and benefit from the Lease, Respondents had no right to enforce the HALPA and the trial court's judgment should be reversed." Missing here is the connection between the lenders' security interest in the lease and respondents' "authority" to enter into the LPA and enforce their contract rights thereafter.

A clearer explanation accompanies appellants' renewal of their contention that the statute of limitations has expired on respondents' claims. The longest statutory period, they point out, is the four-year limit for breach of contract. (Code Civ. Proc., § 337.) According to appellants, respondents' causes of action arose in August 2000, giving them four years to bring the contract claims and three years for the others. Thus, appellants argue, the longest limitations period expired in August 2004. As HALP and Berg & Berg were not named as parties until the amended cross-complaint,[9] they should have been dismissed from the action.

Appellants make no effort, however, to address the trial court's rulings on this issue. Unquestionably, the limitations period for breach of contract[10] was tolled between the imposition of the stay on May 15, 2001, and the order lifting the stay, which apparently occurred on July 10, 2006.[11] Under Code of Civil Procedure section 356, the period of the stay "is not part of the time limited for the commencement of the action." Appellants' resort to the applicable statutes of limitations is without foundation.

---

[9] Appellants state that HALP and Berg & Berg were not named as parties until 2007. The record indicates, however, that these entities were made defendants in the amended cross-complaint, which was filed in November 2006.

[10] It is unnecessary to discuss the applicability of the statutes of limitations for the other causes of action in the cross-complaint, because the trial court found no breach of fiduciary duty, conversion, or basis for dissociating MWLP from the partnership.

[11] The superior court represented this to be the date the stay was lifted, though the July 2006 order is not in the appellate record.

Equally unavailing is their reliance on the doctrine of res judicata to exempt MWI from liability. Appellants contend that the Court of Special Appeals of Maryland found that MWI was not liable "based on the evidence presented at trial" and because it "cannot be liable by virtue of its status as a general partner of [MWLP]." Appellants' representation of the Maryland disposition is misleading. The court of special appeals held that Maryland courts did not have personal jurisdiction over MWLP, and that MWI, as the general partner, could not be liable independently of MWLP. Accordingly, the court vacated the lower court's judgment in appellants' favor. That state's highest court, the Court of Appeals of Maryland, affirmed on the same grounds. Contrary to appellants' representation, the Maryland courts did *not* rule on the merits of respondents' allegations of liability. The rationale as it pertained to MWI was not that "there was no evidence in the record that [MWI] did anything wrong," but that there was no evidence of wrongdoing *separate* from that of MWLP.

■    Thus, the only preclusive effect of the Maryland judgment is the issue of personal jurisdiction. (See *Bank of America v. Jennett* (1999) 77 Cal.App.4th 104, 114 [91 Cal.Rptr.2d 359] [if court of one state expressly decided issue of jurisdiction, " 'its determination is res judicata and is itself protected by the full faith and credit clause' "]; *Lewis v. Linder* (1963) 217 Cal.App.2d 150, 152 [31 Cal.Rptr. 563] [same].) The superior court correctly ruled that res judicata could not be used as a procedural device to avoid liability on respondents' cross-complaint. (Cf. *Gorman v. Gorman* (1979) 90 Cal.App.3d 454, 462 [153 Cal.Rptr. 479] [dismissal of proceeding "for procedural reasons such as lack of jurisdiction is not res judicata as to the merits of any underlying substantive question"]; *Lockwood v. Sheppard, Mullin, Richter & Hampton* (2009) 173 Cal.App.4th 675, 682 [93 Cal.Rptr.3d 220] ["A dismissal on the merits has res judicata effect [citation]; a dismissal for lack of jurisdiction does not . . . ."]; see also Rest., Judgments, § 49 ["Where a valid and final personal judgment not on the merits is rendered in favor of the defendant, the plaintiff is not thereby precluded from thereafter maintaining an action on the original cause of action and the judgment is conclusive only as to what is actually decided."].)

### Conclusion

The trial court's factual findings were supported by substantial evidence. In light of those findings, the court correctly applied the provisions of the LPA and the HALP-Stellex Microwave lease as well as statutes and legal principles applicable to the parties' dispute. Reversal is not required.

*Disposition*

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied August 11, 2011, and appellants' petition for review by the Supreme Court was denied October 12, 2011, S196017.