Filed 10/20/22  Sheldon Development v. SCG America Group CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHELDON DEVELOPMENT, LLC, Plaintiff and Appellant, v. SCG AMERICA GROUP, INC., et al., Defendants and Respondents. | G059833 (Super. Ct. No. 30-2017-00901831) ORDER DENYING REHEARING AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |

Respondents' petition for rehearing is DENIED.

The opinion filed September 21, 2022, is hereby modified in the following particulars:

1.  On page 12 under subheading B. entitled "Unlawful, Unfair, or Fraudulent Business Practices (12th Cause of Action)," insert the following text: "Sheldon Development's 12th cause of action survives for a similar reason.  The diversion of profits from L&D in the form of kickback payments to Pang, Wei, or anyone else associated with SCG and Investel was unfair, if not unlawful.  The standard for what constitutes unfair conduct is quite broad.  (See *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539.)  Because the kickback arrangement reduced the amount of profits available to L&D, both it and Sheldon Development were conceivably harmed by it."

2.  On page 14, under subheading V. entitled "Conspiracy (14th Cause of Action)," second paragraph, third sentence, delete the phrase "and L&D would not have a voice in Investel's management of the project, which was a requirement for the City's approval of the assignment to SCG."

This modification does not effect a change in the judgment.

BEDSWORTH, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

Filed 9/21/22  Sheldon Development v. SCG America Group CA4/3 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHELDON DEVELOPMENT, LLC, | |
| Plaintiff and Appellant, | G059833 |
| v. | (Super. Ct. No. 30-2017-00901831) |
| SCG AMERICA GROUP, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Frederick Paul Horn, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed.

Knypstra Hermes & Zermeno, Bradley P. Knypstra, Grant Hermes and Maggie R. Simoneaux-Cuaso for Plaintiff and Appellant.

Perkins Coie, Eudeen Y. Chang, Anne B. Beaumont and Oliver M. Gold for Defendants and Respondents.

## INTRODUCTION

A motion for summary judgment is properly denied where it does not "refute tenable pleaded theories." (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 942.) This is such a case.

It centers on a real estate development project in the City of Garden Grove (the City). The dispute is primarily between three parties who, at one time, joined forces for purposes of securing rights to the project. But when things went south for them, their dispute reached others. Plaintiff here discovered it had been cut out of the deal and has sued not only the two other parties – alleging tortious interference theories – but also some third-party entities who negotiated for and obtained an assignment of the development rights from plaintiff's former associates. It is plaintiff's claims against those third-party entities which are the focus of the summary judgment motion we now review.

It appears to us that the third parties moved for summary judgment on theories they wanted to address rather than the theories plaintiffs plausibly alleged. And the trial court, while producing a detailed and thoughtful ruling, nevertheless seems to have weighed evidence and construed it in defendants' favor (See pp. 10-13, *infra*). This was error which we reverse.

## FACTS

### *Background*

The parcel at issue, Site C, consists of five acres of land within the "Grove District" at the corner of Harbor Boulevard and Twintree Lane in the City. In or around 2010, the City's redevelopment agency, which owned Site C, was searching for a private partner to develop it into a resort destination given its proximity to Disneyland. Respondent Land & Design, Inc. (L&D) and its principal, Matthew Reid, sought to be that partner. Reid brought in an associate, David Rose, a developer from Riverside County. L&D, Reid, and Rose began pursuing talks with the City. At first, Reid and

Rose were under the impression L&D had the deal in the bag. Later, however, they came to find out another major local player, McWhinney, was vying for the project as well. [1] The team was advised they would need to compete for the agency's approval and then negotiate and execute a development and disposition agreement (DDA) to procure the development rights to Site C.

Reid and Rose felt they needed help in this regard. Rose told Reid to look at bringing Steve Sheldon (Sheldon), a local developer, into the deal.

*Sheldon Development and the Alleged Partnership*

According to Sheldon, he was approached because L&D, Reid, and Rose were an unknown quantity and had been unsuccessful in wooing the City on their own. They needed someone with the connections to get them an exclusive negotiating agreement (ENA) so they could get a foot in the door to negotiate a DDA and obtain the development rights for the parcel. Sheldon says he had previous projects in the City and had obtained ENA's and DDA's before, which gave him such expertise and relationships.

On or about October 19, 2010, Reid, Rose, and Sheldon met to discuss a preliminary partnership agreement to allow them to share profits on the project. The following day, Rose sent both of his counterparts a draft preliminary partnership agreement (PPA), containing the following deal points: (1) Sheldon's company, appellant Sheldon Development, LLC (Sheldon Development), would become a partner of both L&D and Rose's company, E-Ticket Hospitality, LLC (E-Ticket), on the project; (2) Sheldon Development would receive 10 percent of L&D and E-Ticket's combined net profits (including project development fees, refinancing, distributions, or sales proceeds

---

[1] In his deposition testimony, Rose vividly recalled how he and Reid obtained a meeting with the City's former mayor and expressed concern about their potential competition for the project. The former mayor was very supportive of Reid and Rose's bid until he heard their competition was McWhinney, at which time the mayor "basically pushed back from the table."

from the project); (3) if the project obtained a transient occupancy tax rebate of 75 percent for at least 15 years, Sheldon Development could up its cut to 15 percent.[2]

There is a dispute as to whether the PPA was ever consummated once the draft was transmitted to Sheldon. Sheldon says he signed and returned the document to Reid. Reid claims neither he nor Sheldon assented to the terms in the draft PPA and it never came to fruition because he allegedly discovered Sheldon's reputation with the City was less than stellar. Based on this, he says L&D no longer pursued any sort of partnership with Sheldon.

*L&D Obtains Rights to the Project*

L&D signed an ENA with the City in December 2010. Sheldon says this occurred after he had made numerous overtures to the City staff and elected officials on behalf of the purported partnership. Rose testified that Sheldon did, in fact, do work in this regard. On June 14, 2011, L&D executed a DDA with the City.

Later in 2011, however, the Legislature passed Assembly Bill Nos. IX 26 and IX 27, dissolving all redevelopment agencies in the state and transferring control of the agency assets to successor agencies. (See *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 250 (*Matosantos*).)[3] As a consequence, the existing DDA had now to meet the approval of the California State Department of Finance.

That endeavor failed. The Department of Finance found the DDA was not an enforceable obligation of the state. Still wanting to move forward, however, the City and L&D got around the hurdle by executing a similar DDA on April 9, 2013. Reid by this time desired to cut ties with Sheldon and told Rose he did not want Sheldon to know about the new DDA.

---

[2]   This last item was termed the "increased partnership interest potential."

[3]   These bills were passed in response to the state's fiscal emergency declared in 2010. (*Matosantos*, *supra*, 53 Cal.4th at p. 250.)

4

*SCG's Purchase of Development Rights from L&D*

After it procured the new DDA, L&D began marketing the project. Rose's broker connected L&D with respondent SCG America (SCG) as a potential buyer, and they began negotiating over the potential assignment of L&D's rights. L&D and SCG had reached an understanding by November 2014.

SCG contacted the City to get a report on the status of the DDA and the City approvals for the project. On December 11, 2014, City Manager Matthew J. Fertal sent the requested report via letter to SCG's executive vice-president, YingFeng "Danny" Wei, and its vice-president, Lorraina Pang. Fertal made clear in his letter that the City would only be willing to consider assigning the DDA to SCG if SCG and L&D came to their own agreement on the assignment terms "in a timely manner."

That agreement, however, was elusive. After SCG expressed concerns about hotel and restaurant interest in the project as well as what it perceived to be insufficient incentives for it to purchase the project, Reid terminated the L&D-SCG memorandum of understanding on December 15, 2014.

Even though negotiations with SCG were faltering, L&D's new DDA required the City to enter into a joint compensation agreement with all taxing entities having jurisdiction over Site C, including the Orange County Water District (OCWD). It just so happens that Sheldon sits on the board of directors of the OCWD. When the joint compensation agreement came before him as a board member in early 2015, he notified OCWD general counsel that there was a potential conflict of interest because he had an interest in the project. The Orange County Board of Supervisors recognized the conflict of interest and documented it in the May 5, 2015 Board of Supervisors meeting minutes.

Reid knew this was a problem. If all taxing entities did not sign off on the joint compensation agreement, "the deal would . . . die[]." Consequently, L&D, Reid, and Rose contacted Sheldon to discuss the issue he raised. Sheldon proposed they meet to "resolve [their] partnership issues[.]" Reid and Rose denied the existence of any

5

partnership. But in the interest of moving things forward, they told Sheldon they wished to "eliminate [his] potential conflict" with the project. They also asked Sheldon to refrain from representing himself as a partner or a representative on the project.

From Sheldon's perspective, Reid and Rose's proposal was unacceptable. What they wanted him to do was sell them his interest for what he believed was "pennies on the dollar." With the three former associates at an impasse, the City and L&D found a workaround that would allow OCWD's name to be removed from the joint compensation agreement.

On March 25, 2016, SCG and L&D signed a new memorandum of understanding, by which SCG would purchase L&D's development rights for $7 million and hire Reid as a development consultant on the project for four years. They agreed to form a joint venture entity, correspondent Investel Garden Resorts, LLC (Investel), to receive the assignment of the property and development rights. Investel came into existence on June 7, 2016, and L&D had a minority, class B stake in it.

The City approved the assignment to Investel on or about June 28, 2016, and two years later, on January 12, 2018, Investel entered into a development agreement with the City which was recorded on January 17, 2018. Sheldon Development received no funds or compensation for any work Sheldon performed.

Sheldon Development filed suit against – amongst others – L&D, Reid, SCG, Investel, and Rose.[4] For purposes of this appeal, however, we focus only on Sheldon Development's claims against the respondents, SCG and Investel. Sheldon Development accused them of tortious interference, conspiracy, inducing breach of contract, unjust enrichment, and aiding and abetting L&D, Reid, and Rose's alleged

---

[4] Rose and Reid's partnership eventually went belly-up as well when Reid decided to move forward with SCG against Rose's objection. Rose also filed suit against LD, Reid, SCG, and Investel. Rose's lawsuit was consolidated with Sheldon Development's lawsuit, but the Rose lawsuit is not a subject of this appeal.

6

breach of fiduciary duty.[5] The operative pleading alleged, in a nutshell, that SCG was aware of Sheldon Development's purported partnership with L&D, Reid, and Rose, and it suppressed the value of the project and helped them divert profits to Investel where Sheldon Development could not reach them.

SCG and Investel moved for summary judgment, or alternatively, summary adjudication on all causes of action alleged against them. The trial court granted the motion.

## DISCUSSION

On appeal from a grant of summary judgment, "we independently examine the record in order to determine whether triable issues of fact exist to reinstate the action." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) Having done so, we conclude the motion was granted in error.

SCG and Investel's motion was posited on three main contentions.[6] First, SCG and Investel were not the cause of any rupture in Sheldon Development's relationship with L&D, Reid, and Rose. Second, neither SCG nor Investel had knowledge or awareness of Sheldon Development's purported interest in the project until the lawsuit was filed. Third, Sheldon Development can point to no independently wrongful act to support its tortious interference and unfair business practices claims. Even where SCG and Investel met their moving burden as to these contentions, however, Sheldon Development was able to adduce evidence to dispute material facts on which they are based.

---

[5] Specifically, the causes of action against SCG and Investel were intentional interference with prospective economic advantage (Eighth cause of action), negligent interference with prospective economic advantage (Ninth cause of action), intentional interference with contractual relations (10th cause of action), inducing breach of contract (11th cause of action), unlawful, unfair, and fraudulent business practices (12th cause of action), unjust enrichment (13th cause of action), conspiracy (14th cause of action), and aiding and abetting breach of fiduciary duty (15th cause of action).

[6] There are other contentions specific to individual causes of action, which we address later in the opinion.

7

**I.        L&D and E-Ticket's Contractual Right to Sell/Lack of Causation (Eighth through 15th Causes of Action)**

Causation is a necessary element of each of Sheldon Development's causes of action.  In their summary judgment motion, SCG and Investel attempted to negate this necessary element by pointing to a "flipping provision" in the PPA granting L&D and E-Ticket an absolute right to sell the project.  This provision states in pertinent part: "If in the event that [L&D] and E-Ticket determine, in their absolute and sole discretion, that it is in the Project's best interest to sell or 'flip' the Project during the D.D.A. period . . . then Sheldon shall be entitled to receive 10% of [L&D] and E-Ticket's combined net profits[.]"  The provision immediately following states Sheldon Development's right to profit participation would cease if L&D and E-Ticket "decide[] to sell the Project[.]"

SCG and Investel argue L&D merely exercised this contractual right, which they were permitted to do "without any qualification."  (See *Augustine v. Trucco* (1954) 124 Cal.App.2d 229, 245-246.)  Because L&D had the absolute right to sell the project to them, SCG and Investel's mere purchase of the development rights could not be the cause of Sheldon Development's harm.

In our view, this argument reflects a fundamental misunderstanding of the allegation.  SCG and Investel were not sued on the basis of their purchase of development rights.  They were sued because they allegedly manipulated L&D and Reid into (a) suppressing the project's actual value, (b) forming a single-purpose entity (seemingly unknown to both Rose and Sheldon) to divert the profits from the sale; and (c) paying kickbacks to their executives in exchange for the purchase.  If we assume Sheldon Development had a valid and enforceable agreement with L&D and E-Ticket – a question we have not been asked to resolve – each one of the above actions by SCG/Investel could very conceivably have caused harm.  SCG and Investel did not meet their moving burden on the causation prong because their argument does not actually address the claim being made.

8

## II. SCG's and Investel's Awareness of Sheldon Development's Involvement (Eighth, Ninth, 10th, 11th, 14th and 15th Causes of Action)

Another element integral to many of the claims is knowledge. Where a claim is made for inducing breach of contract or interference with contract, a party is not liable if he has "no knowledge of the existence of the contract . . . though an actual breach results from his lawful and proper acts." (*Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 37.) Similarly, claims for interference with prospective economic advantage require the plaintiff to show defendant knew interference was certain or substantially certain to occur. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1156-1157 (*Korea Supply*).)

SCG and Investel submitted declarations from executives who worked on the deal, including Wei and Pang, and those individuals claimed they did not know Sheldon Development had any involvement in the project until after the present lawsuit was filed. In response, Sheldon Development pointed to Reid's deposition testimony. At least twice, Sheldon Development's counsel asked Reid whether he expressed to SCG his concerns over getting OCWD's approval on the compensation agreement. Both times, he responded that SCG was already aware of the problem.[7] In fact, Reid said he suggested

---

[7] When Sheldon Development's counsel attempted to clarify this aspect of his testimony, Reid (taking cues from his counsel's objection) then said he did *not* know whether SCG was aware of the problem:

"Q. Okay. So SCG knew that if they couldn't get this compensation agreement done, that they may not be able to go forward with the deal; is that correct?

"[¶] . . . [¶]

"THE WITNESS: Again, I'm not aware of what SCG was thinking or not thinking or their attorneys.

"BY MR. KNYPSTRA:

"Q. But you just testified that SCG was aware of the compensation agreement, correct?

"MR. ALLISON: Objection. Misstates the prior testimony.

"BY MR. KNYPSTRA:

"[¶] . . . [¶]

"Q. SCG was aware of the compensation agreement, correct?

"MR. ALLISON: Objection. Lacks foundation.

"THE WITNESS: I don't know if SCG was aware – was aware of that."

to SCG that "they should move forward" with the deal in spite of the issue because Sheldon "absolutely was not a partner in the project [and] had no interest in the project[.]"

This testimony raises a triable issue of material fact as to whether SCG was aware of Sheldon's claimed conflict of interest well before it entered into a memorandum of understanding with L&D. Additionally, the purported conflict of interest was documented in public records like the Board of Supervisors meeting minutes. There is sufficient evidentiary conflict to require a factfinder to resolve this issue.

**III.** **Independently Wrongful or Unlawful Act (Eighth, Ninth and 12th Causes of Action)**

**A.** **Intentional and Negligent Interference with Prospective Economic Advantage (Eighth and Ninth Causes of Action)**

"The tort of interference with prospective economic advantage protects the same interest in stable economic relationships as does the tort of interference with contract, though interference with prospective advantage does not require proof of a legally binding contract. [Citation.] The chief practical distinction between interference with contract and interference with prospective economic advantage is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective. [Citations.]" (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126, fn. omitted.)

For both negligent and intentional interference claims, it is necessary for a plaintiff to show the defendant's conduct was wrongful in and of itself. (See *National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 440.) Similarly, for claims under Business and Professions Code section 17200, the conduct

---

Reid's ambiguous testimony here is best assessed by a factfinder who can assess credibility. On summary judgment, neither we nor the trial court may do so.

10

alleged must be fraudulent, unlawful, or unfair. (*Korea Supply*, *supra*, 29 Cal.4th at p. 1143.)

"The requirement that the defendant's interference be *independently* wrongful means that it is not enough for a plaintiff to show that the defendant interfered with the plaintiff's economic relationship with the third party (*Della Penna* [*v. Toyota Motor Sales, U.S.A.* (1995)] 11 Cal.4th [376,] 378-379, 392-393; *Ixchel* [*Pharma, LLC v. Biogen, Inc.* (2020)] 9 Cal.5th [1130,] 1142 [(*Ixchel*)]), even if the defendant did so with an improper motive. [Citations.] To establish that the defendant's interfering conduct was *independently* wrongful, the plaintiff must instead prove that the conduct – whether directed at the plaintiff or someone else – was '"proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."' (*Ixchel*, [*supra,* 9 Cal.5th] at p. 1142, quoting *Korea Supply*, [*supra,* 29 Cal.4th] at p. 1159; *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1152; *Crown Imports* [*, LLC v. Superior Court* (2014)] 223 Cal.App.4th [1395,] [conduct need not be 'independently wrongful as to the plaintiff']; accord, *Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153-1154 [defendant's conduct breached a fiduciary duty; independently wrongful]; *PMC, Inc. v. Saban Entertainment, Inc*. (1996) 45 Cal.App.4th 579 [, 602-603] [defendant's conduct violated 'federal or state law or unethical business practices,' such as 'defamation, trade libel or trade mark infringement'; independently wrongful], disapproved on other grounds in *Korea Supply*, [*supra,* 29 Cal.4th] at p. 1159, fn. 11.)" (*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.* (2021) 71 Cal.App.5th 528, 538-539).

In their motion for summary judgment, SCG and Investel argued their conduct violated "no law, legal obligation, or standard," and Sheldon Development was unable to identify any such law or standard. But Sheldon Development's opposition, in our view, convincingly contradicts this assertion. Rose testified in his deposition that Pang and Wei told him and Reid that SCG would not move forward with the site C

11

project unless they were paid a 10 percent kickback.  Near the time the deal was reached, a company was formed by Pang's brother to receive the 10 percent payment in order to direct it to Pang and Wei.[8]

SCG and Investel dismiss the kickback assertion as a non-issue because Sheldon Development has "no evidence that the conduct was directed with the specific intent to interfere with the alleged" PPA.  But no such evidence is required for the claim, as the California Supreme Court has expressly stated.  (See *Korea Supply, supra,* 29 Cal.4th at p. 1154.)  Rather, it is enough if the "defendant knew that the interference was certain or substantially certain to occur as a result of its action." (*Ibid*.)  If SCG knew Sheldon Development was claiming an interest in the project and a cut of the profits, it would have realized its action of demanding kickbacks would reduce the amount available to any of L&D's partners.

SCG and Investel further argue that Sheldon Development is mischaracterizing the payments:  both they and the trial court observed that there is evidence tending to show the payments were actually legitimate consulting fees.  In saying this, however, SCG and Investel are conceding the issue is triable.  It is for a finder of fact to decide what the evidence shows, not a court.  The *possibility* of unlawful conduct here is sufficient to send the matter to a jury.

**B.  Unlawful, Unfair, or Fraudulent Business Practices (12th Cause of Action)**

**IV.        Unjust Enrichment (13th Cause of Action)**

Sheldon Development's unjust enrichment claim alleges Reid, Rose, L&D, SCG and Investel all received a benefit from Sheldon's work connecting the parties with local decisionmakers, without paying for it.  SCG and Investel attack this claim on the

---

[8]      Because there is sufficient evidence in the record to cast doubt on the channeling of payments to the entity, we need not take judicial notice of the entity's history with the California Department of Real Estate as requested by Sheldon Development.

basis that California law does not recognize a cause of action for unjust enrichment, and even if it did, Sheldon Development presented no evidence to show any unjust enrichment.

The latter argument is simply inaccurate (and we respectfully disagree with the trial court to the extent it found otherwise). All parties, including SCG and Investel, presumably agree that an ENA to negotiate with the City was absolutely essential to the project's success. Indeed, this is where Sheldon Development alleges it provided value added. Without the ENA, SCG and Investel would never have acquired the rights and therefore, they benefited from Sheldon's work – at least, so the theory goes. This kind of theory has purchase (See, e.g., *Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal.App.5th 230, 239 [tax preparer was entitled to restitution from developer for reducing delinquent taxes owed on foreclosure property]), and it will be up to a trier of fact to decide how much.

SCG and Investel's other argument does not persuade us either. It is true that, as we have stated, "[t]here is no freestanding cause of action for 'restitution' in California." (*Munoz v. MacMillan* (2011) 195 Cal.App.4th 648, 661 (*Munoz*), quoting *Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793.) But one must be careful not to apply this principle in an overly technical way. "Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.' (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 388–389; see also *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 346 ['Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred "is an *obligation* (not a true contract [citation] ) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money"'].)" (*Munoz, supra,* 195 Cal.App.4th at p. 661.)

"Unjust enrichment is synonymous with restitution. (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1314.) [¶] 'There are several potential bases for a cause of action seeking restitution. For example, restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason. [Citations.]'" (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370.)

Should the finder of fact ultimately determine there was no enforceable agreement between Sheldon Development, L&D and E-Ticket, all defendants would have received the benefit of Sheldon's services without payment. This is a situation for which a quasi-contract theory would be appropriate. This is another issue for the trier of fact.

## V.        Conspiracy (14th Cause of Action)

Finally, SCG and Investel misapprehend Sheldon Development's conspiracy claim just as they have misapprehended its interference claims. The claim as alleged is SCG, Investel, Reid, Rose and L&D conspired to conceal "the purchase" from Sheldon Development.

SCG and Investel correctly point out that their purchase of the project was always public knowledge because it had to be approved by the City. But Sheldon Development argues the *terms* of the purchase were concealed. Namely, SCG would be taking a kickback and L&D would not have a voice in Investel's management of the project, which was a requirement for the City's approval of the assignment to SCG. The word "purchase" in the pleading, liberally construed, refers to the transaction as a whole, including *the terms* of the purchase. Again, SCG and Investel have failed to negate a tenable pleaded theory.

14

## DISPOSITION

Summary judgment in respondents' favor is reversed.[9] Sheldon Development shall recover its costs on appeal.

 

 

 

BEDSWORTH, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[9] Because we reverse the trial court's grant of summary judgment, we need not address Sheldon Development's contention its due process rights were violated by the motion being heard by a judge different from the assigned judge.